UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARIA ALVARADO,

                            Plaintiff,

    -against-

MOUNT PLEASANT COTTAGE SCHOOL
DISTRICT; CHRISTINE LEAMON, Principal of
Edenwald School; JESSICA HARRIS, Principal of
Mount Pleasant Cottage School; DARIA
KOLESAR-WEITMAN; ANTHONY SHEPPARD,

                            Defendants.

No. 18-cv-00494 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

 Plaintiff Maria Alvarado ("Plaintiff") initiated this action on January 18, 2018 by filing a

complaint, which she amended on June 7, 2018, against Defendants Mount Pleasant Cottage

School District (the "School District"), Christine Leamon, Jessica Harris, Daria Kolesar-Weitman,

and Anthony Sheppard (together, the "Individual Defendants") (collectively, the "Defendants").

(*See* Am. Compl. ("AC"), ECF No. 26.)

 Plaintiff asserts seven causes of action arising under federal and state law. Specifically,

Plaintiff alleges that, while teaching at Mount Pleasant Cottage School, (1) the School District

violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), by

condoning a hostile work environment and retaliating against Plaintiff for engaging in protected

activity challenging the same; (2) all Defendants violated the New York State Human Rights Law,

N.Y. Exec. Law § 290 *et seq.* ("NYSHRL") based on the same acts of harassment and retaliation;

and (3) the Individual Defendants engaged in various common-law torts, such as defamation,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/27/19

intentional and negligent infliction of emotional distress, and tortious interference with contract. Plaintiff seeks declaratory relief, compensatory damages, and punitive damages.

Presently before the Court is Defendants' motion to dismiss the AC pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). For the following reasons, the Motion is GRANTED in part and DENIED in part.

## BACKGROUND

### A. Documents Submitted by the Parties

To begin, the parties have spilled substantial ink regarding what documents the Court may properly consider in resolving the Motion. The issue warrants an analysis by the Court before it summarizes the relevant factual allegations.

On a motion to dismiss, a court "may review only a narrow universe of materials" without converting the motion into one for summary judgment. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This generally includes "the factual allegations in plaintiffs' amended complaint, which are accepted as true, [] documents attached to the complaint as an exhibit or incorporated in it by reference, . . . or [] documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). A court may also take judicial notice of documents, like public filings, but cannot rely on them for the truth of the matters asserted therein. *Powell v. Dep't of Educ. of City of N.Y.*, No. 14 CV 2363 (PKC), 2015 WL 5772211, at *1 (E.D.N.Y. Sept. 30, 2015).

For a document to be incorporated by reference, the complaint must make a "clear, definite, and substantial reference" to it. *N.Y. Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 277 (S.D.N.Y. 2013). "Mere discussion or limited quotation of a document in a complaint" does not qualify as incorporation. *DeMasi v. Benefico*, 567 F. Supp. 2d 449, 453

(S.D.N.Y. 2008) (internal quotations omitted).  But even where a document is not incorporated by reference, a court "may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  This requires a party to establish that the plaintiff had "actual notice" of the documents and relied upon them in setting forth his or her claim.  *Id.*; *see also Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 423 n.16 (S.D.N.Y. 2013) ("In order for the contents of a document to be deemed *integral* to the complaint, they must be deemed necessary to the plaintiff's statement of a claim under Rule 8.").

Here, Defendants argue that the Court may properly consider documents attached to the Affirmation of Mark C. Rushfield in support of the Motion (the "Rushfield Aff.") and the Affidavit of Millicent Lee in support of the Motion (the "Lee Aff.").  (Defs. Memo. of Law in Support of the Motion ("Defs. Mot."), ECF No. 39, at 7; Defs. Reply in Support of the Motion ("Defs. Reply"), ECF No. 41, at 7-10.)  These documents include a copy of (1) the School District's New York State Division of Human Rights ("NYSDHR") Position Statement, submitted in response to Plaintiff's Verified Complaint filed before the NYSDHR, as well as attached exhibits; (2) a copy of the School District's Non-Discrimination and Anti-Harassment Policy (the "Policy"); and (3) Plaintiff's September 26, 2016 harassment complaint filed with the School District and Ms. Lee's report addressing it.  Defendants contend that these documents are incorporated by reference in the AC, integral to Plaintiff's claims, and/or suitable for judicial notice.  (Defs. Reply 9.)

Plaintiff disagrees.  Instead, she argues that it would be wholly improper for the Court to consider these documents without converting the Motion into a motion for summary judgment under Fed. R. Civ. P. 56(b).  (Pl. Memo. in Opposition to Defs. Mot. ("Pl. Opp."), ECF No. 40, at

9-11.)  Notwithstanding her position, Plaintiff submits her own exhibit—an email screenshot—for the Court to consider.  (*Id.* at 18.)  The Court addresses the propriety of each document in turn.

### 1.  Defendants' NYSDHR Position Statement and Accompanying Exhibits

Defendants contend that Plaintiff's reference to their September 13, 2017 NYSDHR position statement (the "Position Statement")—a one sentence quotation—makes that report "incorporated by reference" in the AC.  (Defs. Reply 5.)  Similarly, Defendants contend that the AC incorporates by reference Defendant Harris's May 15, 2017[1] New York State Justice Center ("Justice Center") complaint (the "May 15 Complaint"), attached to the Position Statement as Exhibit G.  (*Id.* at 6.)  The Court shares a differing view.

Regarding the Position Statement, although the AC does quote the document in one paragraph (AC ¶ 22), the AC does not make a substantial reference to it.  *See Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985) (concluding that, although documents were "to some extent quoted," they were not incorporated by reference into the complaint).  Nor does the AC in anyway rely—let alone heavily rely—on the terms and effects of the Position Statement.  The AC's single quotation constitutes the AC's sole reference to it.  *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (concluding that a complaint's paraphrasing of events of a disciplinary hearing and a single quotation to testimony from the hearing neither rendered the document incorporated by reference nor made the document integral to the plaintiff's claims).

Although the issue is closer, the Court reaches a similar conclusion regarding the May 15 Complaint.  To start, the AC's reference to the complaint amounts to a mere discussion of

---

[1]  There is a discrepancy between the parties' submissions regarding the date that Defendant Harris filed her Justice Center complaint.  Specifically, the Defendant Harris's complaint, affixed as Exhibit G to Rushfield Aff. Exhibit B, lists the date as May 12, 2017.  Conversely, the AC refers to the date as May 15, 2017.  For ease of reference, as the date of this complaint is irrelevant to the resolution of the Motion, the Court will refer to the document as the May 15 Complaint.

Defendant Harris's decision to file it and a high-level reference to the allegations therein, rather than a substantial discussion of the document and its contents. This level of discussion does not suffice to incorporate the document itself by reference. *See Sira*, 380 F.3d at 67 (explaining that "[l]imited . . . reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint"). Further, the May 15 Complaint is not "integral" to the AC's retaliation claims. Although the AC does rely on Defendant Harris's *lodging* of false accusations to establish retaliatory conduct (AC ¶ 33), it does not stand or fall on the May 15 Complaint's actual *contents*.

Defendants also point to AC paragraph 52 as another reference to the May 15 Complaint upon which the AC relies. (Defs. Reply 4, 6.) Although the May 15 Complaint is not referenced, it appears that several of the factual predicates in support of Plaintiff's defamation claim—many of which appear for the first time in the AC through this paragraph—are premised on allegations therein. Even so, Plaintiff relies on other conduct that she argues independently supports a claim for defamation, which Defendants also identify in their brief (Defs. Mot. 19-20). Accordingly, the Court cannot conclude that Plaintiff "heavily relied" on the terms and effects of the May 15 Complaint so as to make it integral Plaintiff's defamation claim or, more broadly, the AC.[2] *See Sahu v. Union Carbid Corp.*, 548 F.3d 59, 68 (2d Cir. 2008) (concluding that documents from a prior litigation, which the complaint referred to and quoted from, were not integral to the complaint because they were not necessary to the "short and plain statement" of the claim, and instead helped "establish that the complaint's factual assertions [were] 'plausible'").

Notwithstanding the above, the Court may properly take judicial notice of the Position Statement and its exhibits. *See Isabell v. City of New York*, 316 F. Supp. 3d 571, (S.D.N.Y. 2018)

---

[2] Even if the Court did consider the May 15 Complaint, it would not alter its below analysis and the ultimate disposition of the Motion.

("To the extent that a particular filing with the NYSDHR is not referenced or otherwise incorporated into the Amended Complaint, I may take judicial notice of it for purposes of deciding Defendants' motion."); *Macer v. Bertucci's Corp.*, No. 13-CV-2994 (JFB) (ARL), 2013 WL 6235607, at *1 n.1 (E.D.N.Y. Dec. 3, 2013) (noting that "courts regularly take notice of NYDHR filings and determinations relating to a plaintiff's claims"). To the extent it notices these documents, however, the Court will not rely on them for their truth.

### 2. Plaintiff's School District Complaint and Ms. Lee's Report

Defendants maintain that the AC incorporated by reference, and relied upon, Plaintiff's September 26, 2016 internal harassment complaint (the "September 26 Complaint") and Ms. Lee's December 4, 2016 report. (Defs. Reply 4-5.) The Court agrees.

As to the September 26 Complaint, Plaintiff only references this document in the AC in three instances. (*See* AC ¶¶ 20, 24, 24[3].) But Plaintiff's Title VII and NYSHRL retaliation claims are directly premised on the bringing of, and allegations contained in, the September 26 Complaint. Because Plaintiff has actual notice of this documents (as its author) and heavily relied on it to establish her core claims, the Court considers the document as integral to the AC. *See Morrow v. Metro. Transit Auth.*, No. 08 CIV. 6123 (DLC), 2009 WL 1286208, at *4 (S.D.N.Y. May 8, 2009) (concluding that two letters sent to the MTA's President were integral to plaintiff's retaliation claim because they constituted "the alleged protected activity on which that claim depend[ed]"). Given, however, that the information contained in this complaint does not contradict the factual allegations in the AC, the Court will rely on this document only to the extent it supplies relevant dates in resolving the Motion. *See Powell*, 2015 WL 5772211 at *1 (relying on document "to the extent it confirm[ed], or supplie[d], dates of events referenced in the Amended Complaint").

---

[3] The AC contains two paragraphs numbered as 24.

Regarding Ms. Lee's report, the AC provides some background related to the report (AC ¶¶ 21, 22), but only briefly discusses its contents (*id.* ¶ 23). In the absence of a substantial reference to the report, the Court cannot conclude that the AC incorporates it by reference. Nevertheless, Plaintiff heavily relies on the terms and effects of this "delayed, faulty, and flawed" report, including information it allegedly omitted, to establish her claim that Defendants failed to remediate a hostile work environment. (*Id.*) Therefore, the Court concludes that Ms. Lee's report is integral to the AC. *See Rosenman & Colin LLP v. Sandler*, No. 01 Civ. 7123 (GEL), 2002 WL 83657, at *5 n.3 (S.D.N.Y. Jan. 18, 2002) (determining that the court could examine a document not attached to complaint, where plaintiff explicitly referred to a letter in the complaint and relied upon it to establish an essential element of its claim). Again, because the report does not contradict the AC, the Court only relies on it to the extent it supplies relevant dates.

### 3. The Policy

Defendants contend that the School District's Policy, attached as Exhibit A to the Lee Aff., is "implicit in the allegations." (Defs. Reply 5-6.) The Court disagrees. The AC never mentions the Policy, and there is no indication that Plaintiff has heavily relied on it in crafting any of her claims. The Court will not consider the Policy in deciding the Motion.

### 4. Plaintiff's Email Exhibit

In her opposition paper, Plaintiff annexes, as "Appendix A," a copy of an email dated September 28, 2016.[4] Plaintiff offers no argument for why the Court should consider this document. It is was not attached to, or ever mentioned in, the AC, and Plaintiff has not established that she relied upon it in bringing her claims. The Court will not consider this document.

---

[4] The Court notes that the copy of the email was merely attached to the back of the opposition brief, and was not labeled as Appendix A.

**B. Factual Allegations**

The following facts are derived from the AC and, where necessary, the exhibits identified above. They are assumed to be true for the purposes of the Motion.

**1. Defendant Sheppard's Misconduct**

Plaintiff is a social studies teacher who is employed by the School District, a "special act school district" servicing students with disabilities. (AC ¶¶ 1, 5.) During her employment, Plaintiff endured several instances of insensitive mistreatment at the hands of Defendant Sheppard, a former "social worker/dean of students" at the Mount Pleasant Cottage School. (*Id.* ¶¶ 1, 9.)

In several instances, Defendant Sheppard targeted Plaintiff's "race/nationality." For example, in September 2015, he called her "Mexican," even though she is Puerto Rican. (*Id.* ¶ 11; Lee Aff. Ex. B.) Defendant Sheppard also facetiously asked Plaintiff: "[I]f Trump becomes President, are you scared he is going to send you back to Mexico?" (AC ¶ 11.) This same conduct continued in December 2015/January 2016, with Defendant Sheppard again referring to Plaintiff as a Mexican and joking about deportation. (*Id.*; Lee Aff. Ex. B-C.)

Several months later, around June 2016, Defendant Sheppard commented to Plaintiff that she should "adopt a Spanish student in the school" because the student was "Spanish like [Plaintiff]" and because Plaintiff's "family has money." (AC ¶ 12.) Then, on or about September 21, 2016, Defendant Sheppard continued targeting Plaintiff's race/nationality by falsely accusing her of encouraging a student to yell "mamas juevos," which allegedly translated to "mother's balls," in the school's hallway. (*Id.* ¶ 13.) Defendant Sheppard blamed Plaintiff for the student's conduct "merely because she [was] Spanish." (*Id.*)

Defendant Sheppard also targeted Plaintiff's appearance and sex life. For example, around January 2016, Defendant Sheppard made sex-related comments about Plaintiff's apparent weight

gain to several Mount Pleasant Cottage School staff members—including Defendant Kolesar-Weitman, secretary Cathy Faustini, and former principal Monica Baron—and spread rumors that she was pregnant (which she was not). (*Id.* ¶ 14; Lee Aff. Ex. B.) During the same month, Defendant Sheppard also spread a false rumor that Plaintiff was intimately "involved with a coworker named Anthony Anderson." (AC ¶ 15.)

## 2. Plaintiff's Grievance

On or about September 22, 2016, following the "mamas juevos" incident, Plaintiff met with her school Union Representative, Jim Nolan ("Union Representative Nolan"), and District Superintendent, James Gaudette ("Superintendent Gaudette"), to discuss Defendant Sheppard's workplace bullying and harassment. (*Id.* ¶ 10.) Given the conduct she alleged, Superintendent Gaudette recommended that Plaintiff file a Title IX Complaint against Defendant Sheppard. (*Id.* ¶ 16.) Superintendent Gaudette, however, expressed concern about whether an investigation could be handled fairly. (*Id.*) Specifically, he wondered how Defendant Leamon, principal of the Edenwald School, could objectively investigate Defendant Sheppard—her husband—while Ms. Brown, principal of the Mount Pleasant Cottage School (where Plaintiff was employed), was out on administrative leave. (*Id.*)

Plaintiff shared the same concern. (*Id.* ¶ 18.) She explained that she did not feel comfortable with Defendant Leamon handling the investigation because of her marriage to Defendant Sheppard. (*Id.*) Ultimately, Superintendent Gaudette apologized and purportedly stated, "I am so sorry that you have been walking into a hostile work environment." (*Id.* ¶ 19.)

Four days later, on September 26, 2016, Plaintiff filed her harassment complaint against Defendant Sheppard. (*Id.* ¶ 20.) Thereafter, the District assigned Millicent Lee—an alleged subordinate to Defendant Leamon—to investigate Plaintiff's complaint. (*Id.* ¶¶ 21, 23.)

Ms. Lee's investigation took three months and culminated with a report issued on December 4, 2016. (*Id.* ¶¶ 21-22.) The report concluded that Plaintiff's harassment complaint was unfounded; therefore, no disciplinary action was taken against Defendant Sheppard. (*Id.* ¶ 22.) According to Plaintiff, Ms. Lee's report was "delayed, faulty, and flawed" for three main reasons: (1) it took three months to complete; (2) the findings were inconsistent with the School District's decision to ultimately terminate Defendant Sheppard's employment; and (3) the report failed to consider Defendant Sheppard's "mamas juevos" comment, despite Ms. Lee being present when he made it. (*Id.* ¶¶ 21-23.)

### 3. Defendants' Alleged Retaliation

After Plaintiff lodged the September 26 Complaint, School District administrators and staff members purportedly began retaliating against her. (*Id.* ¶ 24.)

For instance, on September 29, 2016, just three days after Plaintiff filed her complaint, Superintendent Gaudette called her into a disciplinary meeting with Union Representative Nolan. (*Id.* ¶ 24.) At the meeting, Nolan and Gaudette brought up an allegation made by Jennifer Becker[5] about Plaintiff's "inappropriate and intoxicated" conduct at a June 2016 prom event. (*Id.* ¶¶ 24-25.) After reviewing videos of the incident, however, Superintendent Gaudette concluded that the allegation was baseless. (*Id.* ¶ 25.)

Two months later, on or about November 2016, Defendant Leamon recommended Defendant Harris—with whom she had a "close professional and personal relationship"—for an interim principal position at Mount Pleasant Cottage School. (*Id.* ¶ 29.) In this role, Defendant Harris became Plaintiff's direct supervisor. (*Id.*) Of note, according to Plaintiff, Defendant

---

[5] The AC does not explain who Ms. Becker is in relation to Plaintiff or the Defendants.

Leamon made this recommendation to help Defendant Harris avoid "being excessed due to layoffs." (*Id.*)

Two months later, on or about January 2017, Superintendent Gaudette terminated Defendant Sheppard's employment with the School District. (*Id.* ¶ 28.) Thereafter, Plaintiff claims that Defendant Harris "teamed together" with Defendant Kolesar-Weitman, the school psychologist and another personal friend of Defendant Leamon, to "repeatedly disparage Plaintiff's character and reputation as a teacher at the Mount Pleasant Cottage School." (*Id.* ¶ 30.) According to the AC, this manifested itself in three distinct ways.

*First*, Defendants Harris and Kolesar-Weitman would interview students and ask questions about Plaintiff, including whether Plaintiff "intimidate[d]" them or other students. (*Id.* ¶ 31.) If a student responded that Plaintiff did not make them feel uncomfortable or intimidated, Defendants Harris and Kolesar-Weitman would claim that they did not believe that the student was telling the truth. (*Id.*) In one instance, Defendants Harris and Kolesar-Weitman threatened a student by telling him that, if he or she did not speak negatively about Plaintiff, they would accuse him or her, at a May 2017 "discharge meeting," of being a bully. (*Id.*)

*Second*, around April 2017, Defendant Kolesar-Weitman "accused" Plaintiff of "just passing kids." (*Id.* ¶ 32.) Plaintiff contends that another administrator, Thomas Zbikowski, heard Defendant Kolesar-Weitman "in her office laughing on the phone and saying these and other false accusations about Plaintiff." (*Id.*)

*Finally*—and most notably—on May 15, 2017, Defendants Harris and Kolesar-Weitman "caused to be filed against Plaintiff a false New York State Justice Center allegation," *i.e.* the May 15 Complaint. (*Id.* ¶ 33.) That complaint "falsely claim[ed]" that Plaintiff abused students at Mount Pleasant Cottage School. According to the AC, Defendants Harris and Kolesar-Weitman

filed this allegation despite having represented to Plaintiff on May 4, 2017, that she was not under investigation regarding any alleged misconduct. (*Id.*) As a result of this complaint, Plaintiff was involuntarily reassigned by the School District and placed on administrative leave.[6] (*Id.* ¶ 34.) This "involuntary reassignment" prevented Plaintiff from working during the summer of 2017 and caused her to lose substantial income. (*Id.* ¶ 34.)

Eventually, on October 27, 2017, the Justice Center determined that allegations against her were unsubstantiated. (*Id.* ¶ 36.) As of the AC's filing, however, the School District had neither reinstated Plaintiff's duties nor provided her with a date to return. (*Id.* ¶ 38.) Instead, it threatened "Education Law Section 3020-a charges" against her, and continued to prevent her from returning to school. (*Id.* ¶¶ 36, 39.)

According to the AC, Defendants and their attorneys have continued to "try to intimidate and pressure former and present students" to make false allegations against Plaintiff. (*Id.* ¶ 38.) As a result of Defendants' conduct, Plaintiff has purportedly had to seek medical and psychological assistance. (*Id.*)

### 4. Plaintiff's State Litigation

Plaintiff eventually filed a complaint against Defendants with the NYSDHR on July 11, 2017, alleging sexual harassment, national origin discrimination, and disability discrimination. (*Id.* ¶ 35.) The complaint was also duly filed with the U.S. Equal Employment Opportunity Commission ("EEOC"). (*Id.*) Later, on November 3, 2017, Plaintiff filed a notice of claim against the Individual Defendants. (*Id.* ¶ 37.) Finally, on December 19, 2017, Plaintiff received from the EEOC a "notice of right to sue" letter. (*Id.* ¶ 40 & Ex. A.)

---

[6]    Plaintiff maintains that the School District has not taken his course of action against other staff members with serious Justice Center charges against them. (*Id.* ¶ 36.)

## C.  Procedural Background

On January 19, 2018, Plaintiff commenced this action pursuant to both federal and state law, alleging that (1) the School District violated Title VII by condoning a hostile work environment stemming from sex-based, race/national origin-based, and disability-based harassments; (2) the School District retaliated against Plaintiff for filing the September 26 Complaint; (3) all Defendants violated NYSHRL based on the same acts of harassment and retaliation alleged in Plaintiff's Title VII claims; and (4) the Individual Defendants engaged in various common-law torts, such as defamation, intentional and negligent infliction of emotional distress, and tortious interference with contract.[7]  (ECF No. 1.)  Defendants then answered on March 19, 2018.  (ECF No. 21.)  At proceedings held on May 24, 2018, the Court granted Plaintiff leave to file an amended complaint and Defendants' leave to file a motion to dismiss or motion for judgment on the pleadings.  Thereafter, on June 7, 2018, Plaintiff filed the AC, which removed her disability-based claims.  Defendants moved to dismiss on July 9, 2018.  (ECF No. 36.)

Defendants seek dismissal on several grounds.  *First*, Defendants contend that Plaintiff's hostile-work-environment claims are barred by Title VII's 300-day limitations period.  (Defs. Mot. 8-12).  *Second*, Defendants argue that Plaintiff has failed to sufficiently allege that Defendants subjected her to a hostile work environment or engaged in retaliation for the September 26 Complaint.  (*Id.* at 12-19.)  *Finally*, Defendants maintain that, without any Title VII claims, Plaintiff's state-law claims lack of pendent jurisdiction.  (*Id.* at 19.)  Alternatively, Defendants contend that Plaintiff has not adequately pleaded any of her state-law claims.  (*Id.* at 19-22.)

---

[7]  Plaintiff also asserted a prima facie tort claim, which she has since withdrawn as repetitive with her tortious interference with contract claim.  (Pl. Opp. 17.)

## STANDARD OF REVIEW

Under Rule 12(b)(6), the inquiry for a motion to dismiss is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

A court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

To determine whether a complaint states a plausible claim for relief, a court must consider the context and "draw on its judicial experience and common sense." *Id.* at 679. A claim is facially plausible when the facts allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## DISCUSSION

The AC contains a total of seven causes of action, all of which are at issue on the Motion. *First*, Plaintiff asserts two causes of action against the School District under Title VII, claiming that the School District violated Title VII by (1) condoning sex-based and race/national origin-based hostile work environments (AC ¶¶ 41-43); and (2) retaliating against Plaintiff based on her engaging in protected conduct (*id.* ¶¶ 47-48). *Second*, focusing on the same conduct at issue in her Title VII claims, Plaintiff asserts two causes of action against all Defendants under NYSHRL. (*Id.* ¶¶ 44-45, 49-50.) *Finally*, Plaintiff asserts three state common-law tort claims against the

Individual Defendants. (*Id.* ¶¶ 51-52 (defamation); *id.* ¶¶ 53-54 (intentional and negligent infliction of emotional distress); *id.* ¶¶ 55-56 (tortious interference with contract).

The Court considers the sufficiency of each of Plaintiff's claims below, as well as, where applicable, its jurisdiction to hear her claims.

## I.   Title VII Hostile Work Environment

### A.  Timeliness under 42 U.S.C. § 2000e-5(e)

Defendants challenge the timeliness of Plaintiff's hostile-work-environment claims. (Defs. Mot. 8-12.) Plaintiff, however, contends that the "pattern of abuse towards [Plaintiff] at the hands of [Defendant] Sheppard are of a continuous pattern" and thus all her hostile-work-environment claims are timely. (Pl. Opp. 12.) As detailed below, the Court holds that Plaintiff's sex-related hostile-work-environment claims are time barred. The Court, however, concludes that Plaintiff has plausibly established that her race/national origin-based claims are timely.

Under 42 U.S.C. § 2000-5(e)(1), "a plaintiff can sue in federal court only after filing timely charges with the EEOC." *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 213 (2d Cir. 2006). If a plaintiff resides in a state that has an entity charged with handling discrimination complaints— such as New York—he or she must file a charge with the EEOC within 300 days of the discriminatory or retaliatory act. *Mackenberg v. N.Y.C. Off-Track Betting*, 42 F. Supp. 2d 359, 370 (S.D.N.Y. 1999). This requirement is "analogous to a statute of limitations. *McPherson*, 457 F.3d at 214 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996)). Therefore, if a plaintiff fails to comport with this requirement, his or her Title VII claim is time barred. *See Nat'l R.R Passenger Corp. v. Morgan*, 536 U.S. 101, 108-09 (2002).

Here, because her complaint before the NYSDHR was duly filed with the EEOC on or about July 11, 2017 (AC ¶ 35), any claim related to conduct occurring before September 14, 2016

will be time barred.  And in the AC, Plaintiff has only alleged one specific act of discriminatory conduct—Defendant Sheppard's September 21, 2016 "mamas juevos" comment—that falls within Title VII's 300-day time period.  (*Id.* ¶ 13.)  Consequently, the other instances of discriminatory conduct described in the AC will be time-barred unless they fall within an applicable exception to the rule.  One such exception, as is relevant here, is the continuing violation doctrine.

Under this doctrine, "if a Title VII plaintiff files an EEOC charge that is timely as to an incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin v. Port Auth. Of N.Y. & N.J.*, 685 F.3d 135, 155-56 (2d Cir. 2012) (internal quotations omitted).  In other words, to make otherwise time-barred conduct actionable, a plaintiff must allege conduct that is "composed of a series of separate acts that collectively constitute one unlawful employment practice."  *Washington v. Cty. of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) (quoting *Morgan*, 536 U.S. at 111).

The continuing violation doctrine has often been found applicable to hostile-work-environment claims.  *See, e.g.*, *Harewood v. N.Y.C. Dep't of Educ.*, No. 18-cv-05487 (KPF) (KHP), 2019 WL 3042486, at *4 (S.D.N.Y. May 8, 2019) (determining that, because plaintiff's last act of an alleged "hostile and ageist work environment" occurred within the 300-day period, her claim was not time barred); *Bampoe v. Coach Stores, Inc.*, 93 F. Supp. 2d 360, 369 (S.D.N.Y. 2000) ("By its nature, a claim of 'hostile environment' discrimination turns on the existence of a continuing violation, rather than on any individual offensive act." (internal quotations omitted)).

For a hostile-work-environment claim to survive a timeliness challenge, a plaintiff must plausibly allege that "(1) the acts occurring before the 300–day cutoff constitute 'part of the same actionable hostile work environment practice,' and (2) at least one act contributing to the claim

occur[ed] within the filing period." *Clarke v. InterContinental Hotels Grp., PLC*, No. 12 Civ. 2671 (JPO), 2013 WL 2358596, at *8 (S.D.N.Y. May 30, 2013). (quoting *Morgan*, 536 U.S. at 118, 120). Furthermore, to be part of the same actionable hostile-work-environment practice, the timely offensive incident must be "sufficiently related" to incidents outside of the limitations period. *See Taylor v. City of New York*, 207 F. Supp. 3d 293, 309 (S.D.N.Y. 2016).

As an initial matter, the continuing violation doctrine does not save Plaintiff's sex-based allegations. The latest date that Plaintiff has alleged sex-based discriminatory conduct—January 2016—is well before the requisite September 14, 2016, cutoff date. (Lee Aff. Ex. B at 2.) In an attempt to avoid dismissal, Plaintiff contends, without support, that the Court cannot conclude "whether the events that occurred after September 14, 2016, qualify as gender-based, national-origin-based, or race-based hostile work environment" because they are issues of fact. (Pl. Opp. 12.) But the AC is not ambiguous on this point. Plaintiff has explicitly alleged that the "mamas juevos" comment was attributed to Plaintiff "merely because she is Spanish." (AC ¶ 13.) This allegation is wholly distinct from Defendant Sheppard's alleged sex-based comments, which targeted Plaintiff's physical appearance and sexual proclivity. Given the drastically different types of discriminatory conduct appearing on the face of the AC, the Court cannot conclude that Plaintiff's untimely sex-based claims are sufficiently related to her timely "mamas juevos" allegation. Accordingly, the Court dismisses as time barred Plaintiff's sex-based hostile environment claims, with prejudice.

The Court reaches a different conclusion regarding Plaintiff's "untimely" race/national origin-based claims. In the AC, Plaintiff alleges that, over the course of a year, she was subjected to various discriminatory statements targeting Plaintiff's Spanish-speaking origin and nationality. These statements, as the AC details, were uttered by the same person, Defendant Sheppard.

(*See* AC ¶¶ 10-13.)  Here, drawing all reasonable inferences, Plaintiff has alleged enough facts to establish that Defendant Sheppard engaged in a series of sufficiently related acts that contributed to what Plaintiff alleges was a hostile work environment.  Because at least one act of a purported race/national origin-based hostile work environment occurred within the 300-day limitation period, *i.e.* on September 21, 2016, Plaintiff's hostile-work-environment claim, as pleaded, is not time barred.[8]  *See Haghpassand v. Reuters Am., Inc.*, 120 F. App'x 859, 862 (2d Cir. 2005) ("A plaintiff who alleges a discriminatorily hostile work environment need plead only one hostile act by defendant within the 300–day filing period to state a timely continuing violation claim.").  Whether Plaintiff has in fact sufficiently alleged facts to support her hostile-work environment-claim under Title VII, however, is a separate question that the Court now addresses.

## B.  Sufficiency of Race/National Origin-Based Hostile-Work-Environment Claim

Plaintiff maintains that any argument about the severity and pervasiveness of Defendant Sheppard's conduct is "premature at this juncture."  (Pl. Opp. 14.)  On the other hand, Defendants have argued, among other things, that Plaintiff's race/national origin-based hostile-work-environment claim is facially not "sufficiently 'severe' or 'pervasive'" to alter the conditions of Plaintiff's employment.  (Defs. Mot. 14.)  As explained below, the Court agrees.

In general, if bringing a hostile-work-environment claim, a plaintiff must show that a defendant's conduct (1) was "objectively severe or pervasive," (2) created an environment that

---

[8]  Defendants contend that a year had passed between Defendant Sheppard's first "'Mexican'/'Trump'" comment and his subsequent "mamas juevos" comment.  (Defs. Mot. 10.)  They nevertheless concede that Defendant Sheppard made similar race/national origin-based comments in June 2016, just five months after Defendant Sheppard's January 2016 comment, and three months prior to the September 2016 comment.  (*Id.* at 11.)  In any event, although there are two multiple-month gaps between each of the alleged incidents, for purposes of resolving this Motion, the common thematic thread tying the facts together is enough for the Court to consider the untimely allegations when assessing the plausibility of Plaintiff's hostile-work-environment claim.  *See Morris v. N.Y. State Police*, 268 F. Supp. 3d 342, 367 (N.D.N.Y. 2017) ("Accordingly, the otherwise-untimely allegations set forth in plaintiffs' proposed pleading will be considered in evaluating the plausibility of their hostile work environment claims.").

was "subjectively perceive[d] as hostile or abusive," and (3) "created such an environment because of the plaintiff's [protected characteristic]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). To survive a motion to dismiss, a plaintiff need only "plead facts sufficient to support the conclusion that she was faced with harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Donahue v. Asia TV USA Ltd.*, 208 F. Supp. 3d 505, 514 (S.D.N.Y. 2016) (alterations in original) (quoting *Patane*, 508 F.3d at 113). Courts will look at "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" *Yan v. Ziba Mode Inc.*, No. 15-cv-47 (RJS), 2016 WL 1276456, at *5 (S.D.N.Y. Mar. 29, 2016) (internal quotations omitted). "While each of these elements is relevant to the inquiry, no single factor is required." *Dawson v. Cty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (internal quotations omitted).

When analyzing severity, a court "must distinguish between merely offensive or boorish conduct and conduct that is sufficiently severe as to alter the conditions of employment." *Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 66 (S.D.N.Y. 2015). Similarly, when analyzing pervasiveness, a court will evaluate whether "the incidents complained of [were] more than episodic." *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015). "In other words, a plaintiff must show either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Yan*, 2016 WL 1276456 at *5 (internal quotations omitted).

Here, Plaintiff has pointed to four incidents, perpetuated by Defendant Sheppard, that support her race/national origin-based hostile-work-environment claim. These incidents include

Defendant Sheppard (1) purposefully misidentifying her as a Mexican instead of a Puerto Rican (AC ¶ 11); (2) tastelessly asking whether she was "scared" that "if Trump becomes President . . . he [would] send [her] back to Mexico" (*id.*); (3) suggesting that she adopt a Spanish student "because he's Spanish like you and your family has money" (*id.* ¶ 12); and (4) perpetuating stereotypical generalizations by attributing a student's Spanish slur to Plaintiff "merely because she is Spanish" (*id.* ¶ 13). As alleged, these comments certainly target Plaintiff's race/national origin. And, as the AC makes clear, Plaintiff subjectively found this conduct offensive. Nevertheless, even when viewed in a favorable light and considering the totality of the circumstances, Plaintiff's claim fails to establish that Defendant Sheppard's alleged conduct was objectively severe or pervasive.

*First*, Plaintiff has failed to establish that the alleged hostile work environment was pervasive. Although Plaintiff's comments are related in substance, they were, at most, isolated and sporadic incidents that occurred over the course of a year. To be sure, there is "no fixed number of incidents that a plaintiff must endure to establish a hostile work environment." *Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002). But courts in this circuit have required more regularity than what Plaintiff has alleged. *See, e.g.*, *Martin v. City Univ. of N.Y.*, No. 17 Civ. 6791 (KPF), 2018 WL 6510805, at *8-9, *12 (S.D.N.Y. Dec. 11, 2018) (dismissing hostile-work-environment claim where defendant's employee made four race- and job-related comments to and about plaintiff during an approximately one-year span); *Lessambo v. PricewaterhouseCoopers, L.P.*, No. 08 Civ. 6272 (WHP), 2010 WL 3958787, at *11 (S.D.N.Y. Sept. 27, 2010) (concluding that the utterance of "three offensive remarks about [] national origin" in a one month period did not suffice to support a hostile-work-environment claim); *Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 264 (E.D.N.Y. 2005) (determining that the utterance of a

racial remark "five times over an approximately five month period" did not amount to a hostile work environment). Simply put, the frequency Defendants' conduct over the course of a year is insufficient to establish the pervasive pattern of discrimination necessary to constitute a hostile work environment under Title VII.

*Second*, Plaintiff has also failed to allege that Defendant Sheppard's conduct was severe. As a general rule, "Title VII . . . does not set forth a general civility code." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). The statute does "not prohibit employers from maintaining nasty, unpleasant workplaces, or even ones that are unpleasant for reasons that are due to the protected characteristic." *Carrington v. Mota*, 16-CV-8061 (GBD) (JLC), 2017 WL 3835883, at *12 (S.D.N.Y. Aug. 31, 2017) (internal alterations and quotations omitted). Here, Plaintiff has not alleged that Defendant Sheppard's behavior was physically threatening or humiliating, or that his comments interfered with her work performance. Instead, each of Defendant Sheppard's remarks, even when viewed together, were, at most, offensive utterances and remarks that seemingly and understandably engendered offensive feelings in Plaintiff. While the Court agrees with Plaintiff that these comments, if true, are tasteless, meanspirited, and sound of ignorance and bias, under these circumstances, they do not meet the requisite standard for a Title VII claim. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("'[M]ere utterance of an . . . epithet which engenders offensive feelings in a[n] employee does not sufficiently affect the conditions of employment" (internal quotations omitted)). Plaintiff's race/national origin-based hostile-work-environment claims are dismissed, without prejudice.

## II. Title VII Retaliation

To state a claim for retaliation under Title VII, a plaintiff must plead facts that show that (1) he or she "participated in a protected activity known to the defendant"; (2) "the defendant took

an employment action disadvantaging" him or her; and (3) there was a "connection between the protected activity and adverse action." *Patane*, 508 F.3d at 115 (citing *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004)); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 89 (2d Cir. 2015) ("[F]or a retaliation claim to survive a motion for judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) "because" he has opposed any unlawful employment practice."). Here, although close, Plaintiff has satisfied all three elements necessary to sufficiently plead a Title VII retaliation claim.[9]

### A. Protected Activity

As an initial matter, Plaintiff has established that she engaged in protected activity by filing the September 26 Complaint with the School District. It is undisputed that "'[i]nformal complaints to supervisors,' instituting litigation, [and] filing a formal complaint are protected activities under Title VII."[10] *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014).

---

[9] At the outset, the Court concludes that the "formal harassment complaint" filed by Jennifer Becker just three days after Plaintiff filed the September 26 Complaint, which Plaintiff, in conclusory fashion, contends created a requisite "but for" retaliatory connection, does not support a Title VII retaliation claim. (AC ¶¶ 24, 24.) Notwithstanding that Plaintiff has not pleaded any facts connecting Ms. Becker's filing of a "formal harassment complaint" to the School District, *see Brown v. Henderson*, 115 F. Supp. 2d 445, 451 (S.D.N.Y. 2000) ("To establish alleged retaliatory harassment by a co-worker, a Title VII plaintiff must prove, among other things, that (i) the alleged retaliatory harassment was sufficiently severe to constitute an adverse change in the terms and conditions of her employment, and (ii) her employer knew about but failed to take action to abate the retaliatory harassment."), her allegations do not actually establish that the School District took an adverse action against her as a result. Instead, the AC is clear that Superintendent Gaudette "ultimately concluded that Ms. Becker's allegation against Plaintiff was baseless." (AC ¶ 25.) For this reason, the Court dismisses any retaliation claim premised on this specific conduct.

[10] Defendants contend that "there is no conduct of the District, as employer, that can reasonably be deemed to constitute . . . the imputed creation of a hostile work environment." (Defs. Mot. 16-17.) Whether Plaintiff has met her burden to establish the District's liability is beside the point. Assuming all the facts in the AC are true, Plaintiff believed she had experienced discriminatory conduct premised on her sex and race/national origin, and she lodged a complaint with the School District as a result. (AC ¶¶ 16-20.) The proper focus of the protected-activity analysis is on Plaintiff's decision to lodge a complaint and whether it was premised on discrimination that would be prohibited by Title VII. *See Middleton v. Metro. College of N.Y.*, 545 F. Supp. 2d 369, 374 (S.D.N.Y. 2008) ("An employee's belief that she was opposing an unlawful employment practice must also be objectively reasonable, in the sense that the asserted opposition must be grounded on sufficient evidence that the employee was the subject of discrimination and harassment at the time the protest to the offending conduct is registered.").

Defendants nevertheless challenge whether Plaintiff had a "good faith" belief when filing her complaint with the School District. (Defs. Mot. 16.) Though Defendants correctly contend that Plaintiff needed to have "objective good faith" when challenging an employment practice (*id.*), the challenged conduct "need not have 'actually amounted to a violation Title VII" to for her conduct to be protected. *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001). Instead, Plaintiff simply needed to establish that she believed she was opposing an employment practice made unlawful by Title VII. *Id.* She has done so here. Sex, race, and national origin are plainly covered under the statute. *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."). As such, Defendants are mistaken in arguing that Plaintiff's failure to state a hostile-work-environment claim precludes her from having engaged in protected activity.[11]

## B. Adverse Employment Decision

Next, Plaintiff has pleaded an adverse employment decision. Under Title VII, the definition of an "adverse employment action" is broad. *Vega*, 801 F.3d at 90. For purposes of retaliation claims, an "adverse employment action" must lead to a "materially adverse change."

---

[11] None of the cases Defendants identify in support of their position that Plaintiff did not engage in protected activity hold otherwise. Indeed, in each case, the challenged conduct was clearly not covered by Title VII. *See, e.g.*, *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 15 (2013) (explaining that plaintiff did not have a good faith belief that she was complaining about conduct prohibited by Title VII because "nothing in [plaintiff's] complaint . . . indicate[d] that 'her sex, in one way or another, played a substantial role in [defendant's] behavior'"); *Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999) (explaining that plaintiff did not provide any facts that established that he was complaining about his "terms and conditions of employment," where he alleged that defendants "acted in a discriminatory manner toward the public"); *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593-94 (2d Cir. 1988) (noting that plaintiff's argument that defendant was "not pursuing affirmative action goals in [its] selection process" was not "properly within the definition of an 'unlawful employment practice'"); *Sullivan-Weaver v. N.Y. Power Auth.*, 114 F. Supp. 2d 240, 243 (S.D.N.Y. 2000) (explaining that plaintiff's claim for discrimination, premised only on a supervisor's preferential treatment of his "paramour," was not cognizable under Title VII). Conversely, here, although the Court has concluded that Plaintiff failed to allege a Title VII hostile work environment, Plaintiff has advanced nonfrivolous allegations about conduct that seemingly implicated her sex and race/national origin, *i.e.*, protected characteristics that Title VII covers.

*Carter v. New York*, 310 F. Supp. 2d 468, 479 (N.D.N.Y. 2004). Ultimately, there is no bright line rule and the context of the decision is what matters. Courts will look at "whether the [alleged adverse action] to which [the plaintiff] was subjected could well have dissuaded a reasonable employee" from "complaining of unlawful discrimination." *Davis-Garrett v. Urban Outfitters, Incorporated*, 921 F.3d 30, 43-44 (2d Cir. 2019).

Here, Defendant contends that the "retaliatory conduct" at issue is the School District's reassignment decisions regarding Plaintiff. (Defs. Mot. 17-18.) Neither party disputes that these were adverse employment decisions. However, Plaintiff also contends that the lodging of the May 15 Complaint should factor into the retaliation analysis. (Pl. Opp. 16.) The Court agrees. Plaintiff has plausibly alleged that the May 15 Complaint's filing created a "materially adverse change" in the conditions of employment, particularly given the totality of the alleged facts.

To be sure, false allegations, alone, may not constitute an adverse employment action. *Spaulding v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 3041 (KAM) (VMS), 2015 WL 12645530, at *38 (E.D.N.Y. Feb. 19, 2015), *adopted by* 2015 WL 5560286 (E.D.N.Y. Sept. 2015) ("A false accusation, absent a change in the terms and conditions of employment, is not sufficient to state an adverse employment action."). But Plaintiff does not claim that she was simply facing false allegations. She has established, at least facially, that not only did Defendants Harris and Kolesar-Weitman lodge purportedly false—and, as the AC alleges, ultimately unsubstantiated—allegations against Plaintiff with the Justice Center, but the complaint also directly resulted in a change in the terms and conditions of her employment, *i.e.*, the involuntary reassignment. (*See* AC ¶¶ 33-34.) Accepting these facts as true, Defendants Harris and Kolesar-Weitman's conduct could plausibly have dissuaded reasonable employees from exercising their protected rights under Title VII.

## C. Causation

The more difficult issue is whether Plaintiff has sufficiently pleaded a but-for connection between her protected activity and Defendants' retaliatory conduct.  Plaintiff contends that the retaliatory connection is "clearly pled" and points to the filing of the May 15 Complaint by Defendants Harris and Kolesar-Weitman and the resulting reassignment by the School District. (Pl. Opp. 16.)  Defendants, however, argue that there is an "absence of retaliatory motive" that can be attributed to the School District's actions.  (Defs. Mot. 18.)  The Court concludes that Plaintiff has failed to sufficiently plead but-for causation related to the School District's reassignment decision, given Defendant Harris and Kolesar-Weitman's status as mandated reporters.  However, although it is a close question, Plaintiff has, at the pleading stage, sufficiently established causation based on Defendant Harris's conduct, which can plausibly be imputed to the School District.  The Court provides a more substantial discussion below.

### i.  *Causal Connection to the May 15 Complaint*

As Defendants correctly note, the Second Circuit's decision in *Vega* provides the relevant framework for the Title VII retaliation analysis.  As the *Vega* Court explained, a plaintiff must plausibly plead a connection between the purportedly retaliatory conduct and his or her engagement in protected activity.  *Vega*, 801 F.3d at 90.  This requires plaintiff to establish that a defendant "took an adverse employment action" against him or her "'because' [he or she] has opposed any unlawful employment practice."  *Id.*  To be "because" of a protected activity, the retaliation must be the "'but-for' cause" of the employer's adverse action.  *Id.*  "It is not enough that the retaliation was a 'substantial' or 'motivating factor.'"  *Id.* at 90-91.  Rather, plaintiff must establish that "the adverse action would not have occurred in the absence of the retaliatory motive."

*Id.* at 91. This "but-for causation standard does not alter the plaintiff's ability to demonstrate causation . . . through temporal proximity." *Id.*

Where a plaintiff attempts to use temporal proximity to establish causation, the "temporal proximity must be 'very close.'" *Garcia v. Yonkers Bd. of Educ.*, 188 F. Supp. 3d 353, 360 (S.D.N.Y. 2016) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). However, there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between" the protected conduct and allegedly retaliatory action. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013). Consequently, although courts have found that, for example, a seven-month gap between the protected conduct and retaliatory action may be "on its own . . . too attenuated to give rise to an inference of but-for causation," *see Avillan v. Brennan*, No. 16 Civ. 5611 (AJN) (RLE), 2018 WL 4680027, at *5 (S.D.N.Y. Sept. 28, 2018), courts have also concluded that gaps of seven and eight months may support a sufficient temporal connection if accompanied by other indicia of retaliatory motive. *See, e.g.*, *Summa*, 708 F.3d at 128-29 ("In addition to the fact that seven months is within the temporal range that we have found sufficient to raise an inference of causation, the other surrounding circumstances—including Miller–Suber's personal knowledge of the lawsuit when she decided to terminate the employment privileges and Miller–Suber's comment about insuring that graduate employees like Summa are able to 'be advocates for the University,' which Connolly took as including litigation-related conflicts—are sufficient to allow an inference of causation here."); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) (concluding that eight months between protected conduct and retaliation was enough for prima facie retaliation claim).

At the heart of Plaintiff's retaliatory claim is the May 15 Complaint. To that end, Plaintiff has alleged that, approximately eight months after filing her complaint about Defendant Sheppard,

Defendant Harris and Defendant Kolesar-Weitman "caused to be lodged against [her] a false New York State Justice Center allegation" that "falsely claim[s] that Plaintiff abused students." (AC ¶ 33.) This resulted in her "involuntary reassignment" by the School District, which it has maintained even though the Justice Center determined the claims were "unsubstantiated." (*Id.* ¶¶ 34, 36.) Although this eight-month gap may be, alone, too attenuated to support her claim, Plaintiff also alleges a pattern of conduct and relationships that indirectly support an underlying retaliatory motivation. For example, Plaintiff has alleged that Defendant Harris—Plaintiff's "direct supervisor" at Mount Pleasant Cottage School—and Defendant Kolesar-Weitman had a "close professional and personal relationship" with Defendant Leamon, the wife of Defendant Sheppard (against whom Plaintiff had lodged the September 26 Complaint, and who subsequently had been terminated from his position in January 2017). (*Id.* ¶¶ 28-29.) In further support of this connection between Defendant Leamon and Defendant Harris, Plaintiff avers that Defendant Leamon allegedly recommended Defendant Harris to be the "interim Principal position" to help Defendant Harris "avoid . . . being excessed due to layoffs." (*Id.*)

Plaintiff also points various instances of conduct by Defendants Harris and Kolesar-Weitman that seemingly targeted Plaintiff. For example, Plaintiff has alleged that, after they interviewed students about whether Plaintiff "intimidated" them and other students without receiving desired responses, Defendants Harris and Kolesar-Weitman eventually "threaten[ed]" one student to get him or her to "speak negatively about Plaintiff." (*Id.* ¶ 31.) In fact, the AC alleges that this pattern of "intimidat[ing] and pressur[ing] former and present students to make false allegations against Plaintiff" had continued "as recently as June 2018." (*Id.* ¶ 38.)

Taking these facts together, Plaintiff has plausibly bolstered a retaliatory motive underlying the May 15 Complaint. Coupling these facts with the eight-month proximity between the

September 26 Complaint and the May 15 Complaint, the Court can conclude that Plaintiff has sufficiently established a but-for connection underlying Defendants Harris and Kolesar-Weitman's conduct against Plaintiff. This conclusion, however, does not end the but-for causation inquiry for the School District.

### ii. Causal Connection to the School District

As Defendants correctly note, Plaintiff's Title VII claim is against the School District, not the individual defendants. To this end, Defendants argue that the purported retaliatory conduct that the *School District* engaged in was reassigning her *after* learning about the May 15 Complaint. (Defs. Mot. 18.) And, as Defendants further explain, Defendants Harris and Kolesar-Weitman were required to report suspected abuses of special-needs students because they are "mandated reporters." (*Id.*) Thus, Defendants contend, Plaintiff has failed to allege that the *School District*'s conduct was in retaliation for her September 26 Complaint. (*Id.* at 18-19.)

Although, in its research, this Court has not identified any case law addressing this identical issue within the Second Circuit, one court that has addressed a similar situation concluded that a party's status as a mandatory reporter severs the retaliatory causal chain. *See Easton v. Shulkin*, No. 6:18-cv-00233-AA, 2019 WL 2870087, at *2 (D. Or. July 3, 2019) ("Here, Plaintiff has failed to make a but-for causal connection. Oregon has a mandatory reporter statute for medical providers. OAR 735-074-0090(1). Therefore, the VA was unable to exercise discretion when reporting Plaintiff's health status to the DMV. Thus, the but-for causation required by law is broken by the interceding force of the mandatory reporting law."). The Court agrees with this reasoning. Here, even if the decision to file the May 15 Complaint was, as plausibly alleged, permeated by purportedly willful misconduct or gross negligence,[12] Plaintiff offers no explanation

---

[12] Mandated reporters do not enjoy absolute immunity for their conduct. Instead, although "[a]ny person participating reasonably and in good faith in making a report . . . shall have immunity from any such liability,

about how the School District would have been aware that Defendant Harris and Kolesar-Weitman were acting beyond the scope of their mandated reporting obligations. As such, absent special knowledge on the part of the School District about alleged impropriety, this statutory reporting requirement effectively extinguishes the causal chain between the September 26 Complaint and the School District's decision to place Plaintiff in an involuntary reassignment.

Plaintiff does not offer any other allegations that would allow this Court to discern an independent retaliatory motive from the School District. And the temporal proximity alone is insufficient to re-establish causation. Consequently, the Court dismisses without prejudice Plaintiff's claim against the School District specifically related to its reassignment decisions.

### iii.    *Vicarious Liability for Conduct of Defendants Harris and Kolesar-Weitman*

The above analysis notwithstanding, Plaintiff has sufficiently alleged facts from which it is plausible that Defendant Harris's conduct could be imputed to the School District.

Courts in this circuit have generally agreed that an employer can be held vicariously liable for the retaliatory conduct of its supervisors. *See, e.g. Bethea v. City of New York*, No. 11 CV 2347 (SJ) (MJA), 2014 WL 2616897, at *7 (E.D.N.Y. June 12, 2014) ("[H]arassment and the retaliation at the hands of a supervisor empowered to take tangible employment actions will trigger an employer's vicarious liability, but an employer is also liable where it has negligently allowed harassment or retaliation to occur or persist."); *Muraj v. UPS Freight Servs.*, No. 04-CV-6563 CJS, 2006 WL 2528538, at *3 (W.D.N.Y. Aug. 31, 2006) (concluding that "under general principles of vicarious liability under Title VII, an employer may be held vicariously liable for tangible employment actions taken by its supervisors," which includes retaliation); *see also Mys v. Michigan Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018) ("An employer is also

---

civil or criminal," a plaintiff may rebut this presumption of good faith with a showing that the reporters engaged in "willful misconduct or gross negligence." N.Y. Soc. Serv. Law § 497.

vicariously liable for retaliation that a supervisor initiates against an employee by causing another actor, that might itself lack retaliatory animus, to take an adverse action against the employee"); *Cross v. Cleaver*, 142 F.3d 1059, 1074 (8th Cir. 1998) ("In the circumstances of this case . . . we hold that, where a supervisory employee with the power to hire, fire, demote, transfer, suspend, or investigate an employee is shown to have used that authority to retaliate for the filing of a charge of sexual harassment, the plaintiff need not also prove that the employer participated in or knew or should have known of the retaliatory conduct to hold the employer liable.").

For purposes of establishing an employer's vicarious liability, the supervisor must be "empowered by the employer to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State University*, 570 U.S. 421, 424 (2013). To be a supervisor, the employee need not have the final say on a tangible employment action; instead his or her decision can be "subject to approval by higher management." *Id.* at 437 n.8.

In the AC, Plaintiff has alleged that Defendant Harris was her "direct supervisor" upon taking over the role of interim principal at Mount Pleasant Cottage School. (AC ¶ 29.) Plaintiff has further noted that the Mount Pleasant Cottage School principal—acting as the School District's Civil Rights Compliance Officer—is an individual who is typically empowered to handle investigations related to school personnel. (*Id.* ¶¶ 17-18; *see also* Defs. Mot. 3.) Based on the AC's allegations, this role appears to permit the principal to, among other things, recommend potential disciplinary action that the School District could impose its personnel. (AC ¶¶ 21-22.) Although the total amount of allegations in the AC on this issue are minimal, Plaintiff has alleged just enough for the Court to reasonably infer that—even if Plaintiff has not alleged

Defendant Harris's specific responsibilities or established that she had any final say in employment decisions—it is plausible that Defendant Harris was a supervisor under the definition set forth by *Vance*.[13]  *See Childress v. Colvin*, No. 13-CV-1959, 2014 WL 796227, at *9 (E.D. Pa. Feb. 28, 2014) ("It is certainly a plausible inference that someone who has the authority to discipline employees and conduct performance evaluations also has the power to hire, fire, promote, reassign, or significantly change an employee's benefits within the meaning of *Vance*."); *see also Delozier v. Bradley Cty. Bd. of Educ.*, 44 F. Supp. 3d 748, 761-62 (E.D. Tenn. 2014) (explaining, on summary judgment, that a school principal, who did not have final decision-making authority, was a supervisor given the "substantial weight" his recommendations and evaluations ultimately had).[14]  At this juncture, then, Plaintiff has sufficiently alleged conduct for which the School District could be liable.  The Court accordingly denies the motion to dismiss Plaintiff's Title VII retaliatory claims premised on the Defendant Harris's filing of the May 15 Complaint.[15]

---

[13]  The Court's decision should not be construed as indicating that the School District, as a matter of law, can or will be held vicariously liable for Defendant Harris's purported conduct.  It is, of course, the case that discovery could very well reveal that Defendant Harris was not a supervisor under *Vance*'s definition.  The Court here simply holds that Plaintiff has pleaded sufficient facts for her claim to survive the Motion.

[14]  *Cf. Ward v. Shaddock*, No. 14-CV-7660 (KMK), 2016 WL 4371752, at *10 (S.D.N.Y. Aug. 11, 2016) (concluding that employee not a supervisor where plaintiff alleged that he (1) "encourage[ed], permit[ed], and condon[ed]" discriminatory conduct; (2) "pre-screen[ed] applicants" in discriminatory manner; (3) "assign[ed] . . evening shift[s]"); *Travis v. City of Chicago*, No. 10 CV 3011, 2014 WL 4909060, at *12 (N.D. Ill. Sept. 30, 2014) (concluding that plaintiff had not established as a matter of law that employee was supervisor under Title VII, where record established that supervisor's control was "limited to distributing daily work assignments . . . and recommending discipline to her superiors").

[15]  Moving forward, the Court is also mindful that it must give mandatory reporters "unusual deference."  Indeed, it is of paramount importance and public policy that mandated reporters be encouraged to report suspected abusive conduct without fear of retribution and liability.  To this end, the Second Circuit has made it clear that a plaintiff challenging a mandated reporter's conduct must clearly establish retaliatory or punitive intent.  *See Maco v. Baldwin Union Free Sch. Dist.*, 726 F. App'x 37, 39 & n.1 (2d Cir. 2018) (citing *Dole v. Huntington Union Free Sch. Dist.*, 699 F. App'x 85, 87 (2d Cir. 2017)) (explaining that even if a "retaliation claim can," in general, "lie . . . where there are 'objectively valid grounds' for the retaliatory action," the "specialized context of a school administrator's decision to report suspected child abuse" requires a plaintiff to establish more in support of his or her retaliation claim).  For this reason, it is quite possible that Plaintiff's claim could falter upon the completion of discovery.  On a motion to dismiss, however, a plaintiff need only plead facts that plausibly allege that a mandated reporter acted with willful misconduct or gross negligence.  *See, e.g.*, *Thomsen v. City of New York*, No. 15cv2668 (DLC), 2016 WL 590235, at *12-13 (S.D.N.Y. Feb. 11, 2016) (denying motion to dismiss where plaintiff sufficiently alleged that defendant acted intentionally and in bad faith in filing false reports against him).  Plaintiff has met her burden here.

The Court reaches a different conclusion for any conduct by Defendant Kolesar-Weitman. If a plaintiff is attempting to establish vicarious liability for a nonsupervisory coworker, he or she must allege that "the employer knew, or reasonably should have known, about" the conduct violating Title VII. *Hoag v. Fallsburg Central Sch. Dist.*, 279 F. Supp. 3d 465, 480 (S.D.N.Y. 2017). Here, as explained above, Plaintiff has not alleged that the School District was aware of— or should have been aware of—actions that violated Title VII at the time Defendant Kolesar-Weitman decided, together with Defendant Harris, to file the May 15 Complaint. For this reason, the Court dismisses any claims against the School District premised on Defendant Kolesar-Weitman's conduct.

## III. NYSHRL Claims

Plaintiff also asserts claims under NYSHRL against all Defendants premised on the same discriminatory and retaliatory conduct discussed above. However, although neither party has raised the issue, the Court *sua sponte* addresses whether it has subject matter jurisdiction to address these claims. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented.").

Under New York Executive Law § 297(9), an individual may seek relief for unlawful discrimination "either from a court of appropriate jurisdiction or from the New York State Division of Human Rights or any local commission on human rights, *but not both*." *Goldson v. Kral, Clerkin, Redmond, Ryan, Perry & Van Etten, LLP*, No. 13 Civ. 2747 (GBD) (FM), 2014 WL 1910624, at *9 (S.D.N.Y. May 12, 2014) (emphasis added) (quoting *Lennon v. New York City*, 392 F. Supp. 2d 630, 640-41 (S.D.N.Y. 2005)). In other words, "a party who files a complaint with the [NYSDHR] is generally barred from commencing an action [on his or her state claims]

in court." *Krause v. Kelehan*, No. 6:17-CV-1045 (LEK/ATB), 2018 WL 2021484, at *7 (N.D.N.Y. Apr. 26, 2018). The statute's "election of remedies" limitation "operates to divest a federal court of jurisdiction to decide the claim." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 74 n.3 (2d Cir. 2010). Further, the "election of remedies" limitation is a "derivative bar" for "claims arising out of the same incident on which [the NYSDHR] complaint was based." *Smith v. Sch. of Visual Arts*, 2016 WL 3440553, at *2 (S.D.N.Y. June 9, 2016) (alterations in original) (quoting *Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 188 (S.D.N.Y. 2011); *see also El Sayed v. Hilton Hotels Corp.*, No. 07-CV-11173 (DC), 2008 WL 3362828, at *5 (S.D.N. Y. Aug. 7, 2008) ("Because the present claims against them are based on the same facts as the administrative complaint filed with the [NYS Human Rights] Division, [plaintiff] is barred from commencing an action against the additional defendants in this Court."). One exception to this rule, however, exists where the NYSDHR has dismissed a complaint "on the grounds of administrative convenience, . . . untimeliness, or . . . that the election of remedies is annulled." N.Y. Exec. Law § 297(9).

Here, Plaintiff has alleged that she "filed a complaint with the New York State Division of Human Rights." (AC ¶ 35.) And the Verified Complaint attached to Exhibit B of the Rushfield Aff. confirms that Plaintiff was pursuing allegations premised on the same incidents at issue in the AC. (Rushfield Aff. Ex. B at Ex. A.) Plaintiff has provided the Court with her EEOC "right to sue" letter, but she has not provided any indication that the NYSDHR dismissed her complaint on "administrative convenience" or "untimeliness," or otherwise annulled her election of remedies. Given that it is Plaintiff's burden to establish subject matter jurisdiction, the Court out of an abundance of caution declines to hear her NYSHRL claims at this time. The Court accordingly dismisses Plaintiff's NYSHRL causes of action, without prejudice.

**IV.    State Common Law Claims**

In addition to Title VII and NYSHRL claims, Plaintiff also asserts three garden variety common-law tort causes of action.  Below, the Court considers the sufficiency of each claim.

**A. Defamation**

Plaintiff premises her defamation claim primarily on "Defendants caus[ing] a false New York State Justice Center allegation to be lodged against her, and that Defendants falsely claimed that she abused students at the school." (Pl. Opp. 17.)  Defendants maintain, however, that Plaintiff has failed to "provide the time when, place where and manner in which allegedly false statements were made." (Defs. Mot. 20.)  Defendants also contend that Plaintiff fails to assert her defamation claim with the "particularity required" under New York law.  (*Id.*)  The Court agrees that Plaintiff's defamation claim is deficient.

To state a claim for defamation under New York law, a plaintiff must allege "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'"  *Gargiulo v. Foster & Garbus Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009) (citing *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (App. Div. 1st Dep't 1999)).  A plaintiff must plead the defamatory statements with some particularity.  N.Y. C.P.L.R. 3016(a) ("In an action for libel or slander, *the particular words complained of shall be set forth in the complaint*, but their application to the plaintiff may be stated generally." (emphasis added)).  Under Fed. R. Civ. P. 8's liberal pleading standards, this requires a plaintiff to "identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Neal v. Asta*

*Funding, Inc.*, 13 CV 2176 (VB), 2014 WL 3887760, at *3 (S.D.N.Y. June 17, 2014). Here, as to each Individual Defendant, Plaintiff has failed to sufficiently state a claim for defamation.[16]

*First*, regarding Defendants Leamon and Sheppard, Plaintiff has not premised any defamation claim against them. Regarding any of Defendant Sheppard's purported comments, Plaintiff either has not pleaded the "particular words complained of," or, where she does provide particular words, has not established that the statements were "reasonably susceptible" to a defamation claim, *see Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (defamatory statement must "expose[] an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . .confidence and friendly intercourse in society.'"). As to Defendant Leamon, Plaintiff has not identified any "false statement" purportedly published to a third party. Plaintiff's defamation claims against Defendants Leamon and Sheppard are dismissed, without prejudice.

*Second*, regarding Defendant Kolesar-Weitman's "just passing kids" comment, Plaintiff has failed to sufficiently plead, even under the lenient federal standard, the requisite time that the statement was made. Indeed, merely alleging that a statement was made during a certain month does not suffice to meet the particularity requirement under New York law. *See Arvanitakis v. Lester*, 44 N.Y.S.3d 71, 73 (App. Div. 2d Dep't 2016) (dismissing claim where plaintiff alleged that defamatory statements were made "September 2012 through the present" because the allegation was not "sufficiently specific with respect to time"). The Court, as such, dismisses without prejudice the claims against Defendant Kolesar-Weitman that are premised on the "just passing kids" comment.

---

[16] Any claim premised on Plaintiff's purported intoxication at a school prom (AC ¶¶ 24-25, 52) is not attributed to any of the Individual Defendants, and thus cannot serve as a basis for liability.

*Finally*, Plaintiff has failed to plead the "particular words complained of" in the May 15 Complaint. Instead, Plaintiff's allegations merely state that the May 15 Complaint stated that she abused students at the school. (AC ¶ 33.) To the extent Plaintiff has referenced a list of "false rumors" premised on that complaint in her defamation cause of action (*see, e.g.*, *id.* ¶ 52), her allegations detail the substance of those rumors but do not, on the face of AC, reflect the specific defamatory words about which she complains. Nor has plaintiff attributed these words to any particular Defendant. The Court therefore dismisses without prejudice the defamation claim against Defendants Harris and Kolesar-Weitman premised on their lodging the May 15 Complaint.

## B. Tortious Interference with Contract

Plaintiff argues that the amended complaint has adequately pleaded a tortious interference claim premised on her reassignment from her duties. (Pl. Opp. 17.) The Court disagrees. Under New York law, a plaintiff must plead the following elements to establish a tortious interference claim: (1) a valid contract existed; (2) a third party had knowledge of the contract; (3) the third party intentionally and improperly procured the breach of the contract; and (4) the breach resulted in damage to the plaintiff. *Krause v. Kelehan*, 2018 WL 2021484 at *15. It is imperative that, in bringing a tortious interference claim, a plaintiff identify "the relevant terms of the contract[] that existed" that were breached by defendant. *See Leadsinger, Inc. v. Cole*, No. 05 Civ. 5606 (HBP), 2006 WL 2320544, at *12 (S.D.N.Y. Aug. 10, 2006); *accord WorldHomeCenter.com, Inc. v. Franke Consumer Prods., Inc.*, No. 10 civ. 3205 (BSJ), 2011 WL 2565284, at *6 (S.D.N.Y. June 22, 2011) ("Under New York law, although such claims are to be construed liberally, a plaintiff must specifically plead the existence of a valid contract and provide some details about its terms and its breach to sustain a claim at the motion to dismiss stage."). Here, although Plaintiff notes that she is an employee within the School District, she has failed to plead, among other things, the

existence of a valid contract and its terms, or the terms of the contract that Defendants caused a third party to breach. As such, Plaintiff's tortious interference claim is dismissed, without prejudice.

**C. Intentional and Negligent Infliction of Emotional Distress**

Plaintiff contends, in conclusory fashion, that Defendants' conduct was "extreme," and it caused her to suffer "negligent, if not intentional, emotional distress." (Pl. Opp. 17.) Again, the Court disagrees. To maintain an action for intentional infliction of emotional distress ("IIED") in New York, a plaintiff must plead four elements: "(1) extreme and outrageous conduct; (2) the intentional or reckless nature of such conduct; (3) a causal relationship between the conduct and the resulting injury; and (4) severe emotional distress." *Mitchell v. Giambruno*, 826 N.Y.S.2d 788, 789 (App. Div. 3d Dep't 2006). Alternatively, for negligent infliction of emotional distress ("NIED"), a plaintiff must premise the claim on a "breach of a duty owed to [him or her] which either unreasonably endangers plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety." *Santana v. Leith*, 985 N.Y.S.2d 147, 149 (App. Div. 2d Dep't 2014).

Here, Plaintiff's IIED and NIED claims are clearly deficient. Regarding her IIED claim, Plaintiff has failed to plead any allegation that, even when viewed in a favorable light, amounts to "extreme and outrageous" conduct by any of the Individual Defendants. *See, e.g.*, *Daniels v. Health Ins. Plan of Greater N.Y.*, No. 02CIV6054MBM, 2005 WL 1138492, at *1-3 (S.D.N.Y. May 12, 2005) (dismissing IIED claim where plaintiff alleged "constant, ongoing, and continuous harassment based on her Race; National Origin and Disability," such as not receiving training, being overloaded with work, being passed over for promotion, failure to accommodate a disability, and discriminatory termination); *Burrell v. City Univ. of N.Y.*, 995 F. Supp. 398, 416 (S.D.N.Y. 1998) (dismissing IIED claim where plaintiff alleged discriminatory and retaliatory conduct, such

as sexual advances by her supervisor, open criticism of her work upon rejecting those advances, assignment of work below her skill set, death threats, accusations of "impropriety and immoral conduct with men" doing business with her employer, and termination purportedly on the basis of her nationality); *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 681 (S.D.N.Y. 1995) (dismissing IIED claim where plaintiff allegedly subjected to discriminatory comments about her pregnancy and gender, false allegations about her work ethic, and termination from employment based on gender and pregnancy). As to NIED, the AC contains no facts indicating, among other things, that Defendants endangered Plaintiff's physical safety or caused her to fear for her safety. In short, Plaintiff's IIED and NIED claims are dismissed without prejudice.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

Plaintiff shall have until September 26, 2019 to file a second amended complaint and cure her pleading deficiencies. Failure to do so will result in those claims being dismissed from this action. Should Plaintiff file a second amended complaint, Defendants will have thirty days, on or before October 28, 2019, from the date of the complaint's filing to answer or respond. The parties shall complete the attached Civil Case Discovery Plan and Scheduling Order and submit it to the Court by November 12, 2019.

If Plaintiff does not intend to file a second amended complaint, she shall notify both Defendants and the Court in writing by September 23, 2019. Defendants shall then file an answer by September 26, 2019. The parties thereafter shall complete the attached Civil Case Discovery Plan and Scheduling Order and submit it to the Court by October 10, 2019.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 36.

Dated:  August 27, 2019                                    SO ORDERED:
        White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge

-------------------------------------------------------------x


                                                    **CIVIL CASE DISCOVERY PLAN**
                              Plaintiff(s),          **AND SCHEDULING ORDER**

            - against -


                              Defendant(s).          _____ CV _____ (NSR)


-------------------------------------------------------------x

        This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with
counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

    1.    All parties [consent] [do not consent] to conducting all further proceedings before
          a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c).
          The parties are free to withhold consent without adverse substantive consequences.
          (If all parties consent, the remaining paragraphs of this form need not be
          completed.)

    2.    This case [is] [is not] to be tried to a jury.

    3.    Joinder of additional parties must be accomplished by
          _____.

    4.    Amended pleadings may be filed until _____.

    5.    Interrogatories shall be served no later than _____, and responses
          thereto shall be served within thirty (30) days thereafter.  The provisions of Local
          Civil Rule 33.3 [shall] [shall not] apply to this case.

    6.    First request for production of documents, if any, shall be served no later than
          _____.

    7.    Non-expert depositions shall be completed by _____.

          a.    Unless counsel agree otherwise or the Court so orders, depositions shall not
                be held until all parties have responded to any first requests for production
                of documents.

          b.    Depositions shall proceed concurrently.

          c.    Whenever possible, unless counsel agree otherwise or the Court so orders,

non-party depositions shall follow party depositions.

8. Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9. Requests to Admit, if any, shall be served no later than _____.

10. Expert reports shall be served no later than _____.

11. Rebuttal expert reports shall be served no later than _____.

12. Expert depositions shall be completed by _____.

13. Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14. **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15. Any motions shall be filed in accordance with the Court's Individual Practices.

16. This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17. The Magistrate Judge assigned to this case is the Hon. _____.

18. If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19. The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)


Dated: _____          SO ORDERED:
White Plains, New York

 

_____
Nelson S. Román, U.S. District Judge