UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/7/2023
```

MARIA ALVARADO,

                              Plaintiff,

        -against-

MOUNT PLEASANT COTTAGE SCHOOL
DISTRICT; CHRISTINE LEAMON, PRINCIPAL
OF EDENWALD SCHOOL, AND JESSICA
HARRIS, PRINCIPAL OF MOUNT PLEASANT
COTTAGE SCHOOL,

                              Defendants.

No. 18-cv-00494 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

        Plaintiff Maria Alvarado ("Plaintiff") initiated this action on January 18, 2018 by filing a

complaint, which she amended on June 7, 2018, against Defendants Mount Pleasant Cottage

School District (the "School District"), and Christine Leamon and Jessica Harris (together, the

"Individual Defendants") (collectively, the "Defendants").  (See ECF No. 1.)  Following the

Court's order granting dismissal of the complaint in part and denying in part (ECF No. 43),

Plaintiff filed a Third Amended Complaint on February 23, 2020. (ECF No. 51, hereinafter

"TAC").[1]  Plaintiff asserts two causes of action in the TAC:  a claim under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e et seq. against the School District for retaliation on the

basis of gender, race, and national origin; and (iii) an analogous claim under the New York State

Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL") against all Defendants, based on

the same acts of retaliation.

        Presently before the Court is Defendants' motion for summary judgment on all claims

_____

[1]        A Second Amended Complaint was filed on September 26, 2019 (ECF No. 44), but the parties
shortly afterwards stipulated to the filing of the TAC.  (ECF No. 49.)

under Federal Rule of Civil Procedure 56 (the "Motion").  For the following reasons, the motion for summary judgment is GRANTED.

## BACKGROUND

The facts below are taken from the parties' Rule 56.1 statements, affidavits, declarations, and exhibits, and are not in dispute except where so noted. All rational inferences are drawn in Plaintiff's favor.

### A.  Factual Allegations

Plaintiff is a social studies teacher who is employed by the School District, a "special act school district" servicing students with disabilities.  (ECF No. 88 ("Defs.' 56.1") ¶ 1.)  The School District operates the Edenwald School and the Mount Pleasant Cottage School, the former of which primarily educates students with intellectual disabilities or autism, along with emotional disabilities, and the latter of which primarily educates emotionally disturbed students.  (*Id*.)  Prior to the relevant events in this action, Plaintiff received a recommendation from Thomas Zbikowski (a curriculum coordinator for the School District) for a Leadership/Administration program, which praised Plaintiff's effectiveness as an educator (ECF No. 100 ("Gould Decl."), Exh. 21.)

Defendant Christine Leamon is the principal of Edenwald School, and is married to Anthony Sheppard ("Mr. Sheppard"), who was employed by the School District from 2006 to 2016 as a social worker and as a dean of students at Mount Pleasant Cottage School.  (ECF N. 92 ("Pl.'s 56.1 Counterstatement") ¶¶ 81–82.)  Defendant Jessica Harris, a special education teacher, was promoted to serve as Interim Principal of Mount Pleasant Cottage School, effective December 17, 2016 to June 30, 2017, by the then-District Superintendent of Schools, James Gaudette, after the former principal resigned from her position.  (Defs.' 56.1 ¶¶ 2, 6–8.)  Before becoming the Interim Principal of the Mount Pleasant Cottage School, Defendant Harris, who had been working at the

2

Edenwald School, did not know Plaintiff, who had been working at the Mount Pleasant Cottage School. (*Id.* ¶ 13.)

### 1. Internal Complaint Against Mr. Sheppard by Plaintiff

On September 22, 2016, Plaintiff and her union representative met with Superintendent Gaudette to report on inappropriate comments made to her by Mr. Sheppard, which made her feel that she was being spoken to in a "sexually harassed way," that he was making comments about her body, and that he made racist comments to her. (Pl.'s 56.1 Counterstatement ¶ 83.) Superintendent Gaudette directed Millicent Lee, a person holding a "Title IX" certification, to conduct an investigation regarding Plaintiff's complaint against Mr. Sheppard. (Pl.'s 56.1 Counterstatement ¶ 85.) Plaintiff argues that the investigation conducted by Lee was cursory, and that she "falsely claimed she completed her report on December 4, 2017. enabling it to appear that she took more than two months to conduct the investigation rather than two days." (Pl.'s 56.1 Counterstatement ¶ 98.) On September 28, 2016, Lee advised Plaintiff that she determined the complaint against Sheppard was unfounded. (*Id.* ¶ 94.)

Defendant Harris testified at her deposition that she had no knowledge that the Plaintiff had made any internal complaint to the District against Mr. Sheppard before August 2017, which was when notice was issued that Plaintiff filed a complaint with the New York State Division of Human Rights. (Defs.' 56.1 ¶ 15.) Defendant Leamon testified that she had not seen the internal complaint filed by Plaintiff against Mr. Sheppard prior to the commencement of this instant action in January 2018. (Defs.' 56.1 ¶ 16.)

### 2. Student complaints about Plaintiff made to School Psychologist, Dr. Daria Weitmann

Some time before May 2017, student SR and another student had complained to Dr. Daria Weitmann (a school psychologist for the School District), in addition to a teacher and a teacher's

aide, about Plaintiff, stating that she demonstrated favoritism towards specific students in her class. (Defs.' 56.1 ¶¶ 17, 22.). Dr. Weitmann testified at her deposition that she reported SR's complaint to the then-principle of Mount Pleasant Cottage School, Christine Beuti, and reported the other student's complaints to Principal Bueti's successor, Principal Monica Baron. (Defs.' 56.1 ¶ 22.)

In or about March or April 2017, student SR met with Dr. Weitmann to discuss an argument she had with Plaintiff, where Plaintiff purportedly threw a water bottle at SR. (Defs.' 56.1 ¶ 23.) Dr. Weitmann met with SR on more than two other occasions, where SR made allegations against Plaintiff, including *inter alia* that Plaintiff called SR "Dusty," paid students to fight other students, and watched video recordings of students fighting. (Defs.' 56.1 ¶ 24.) Dr. Weitmann subsequently reported SR's allegations to Principal Harris and requested that the latter meet with her and SR or other students concerning alleged misconduct by Plaintiff. (Defs.' 56.1 ¶ 25.)

At some point in early 2017, Defendant Harris had asked Mr. Richard Wiltshire, a school safety monitor, to "keep an eye out" on Plaintiff and her teaching aide, Yolando Mercado, based on a concerns that Plaintiff's students were engaging in fights and that Plaintiff was engaging in sexual behavior with another school staff member in her classroom. (*See* Pl.'s 56.1 Counterstatement ¶ 124 n.4; ECF No. 98 ("Defs.' Response to Pl.'s 56.1 Counterstatement") ¶ 124 n. 3.)[2]

Prior to May 12, 2017, but after SR began reporting allegations of misconduct by Plaintiff to Dr. Weitmann, four other students gave similar reports to Dr. Weitmann. (Defs.' 56.1 ¶ 27.) Allegations included that Plaintiff discussed her sexual activity, including with other school

---

[2]      Both Yolanda Mercado and Richard Wiltshire filed claims against the School District and Defendant Harris raising retaliation claims based on, *inter alia*, their refusal to assist in Harris's investigation of Plaintiff's misconduct. Mercado's complaint, filed in federal court, settled on November 18, 2022 (C.A. No. 19-cv-9022-NSR, ECF No.51), and Wiltshire's complaint, filed before the New York Division of Human Rights, terminated on October 17, 2019 after the agency found "no probable cause." (*See* Defs.' Response to Pl.'s 56.1 Counterstatement ¶ 167; (ECF N. 95) ("Rushfield Reply Decl."), Exh D.)

employees, with students, that students were paid by Plaintiff to engage in fights with other students, that Plaintiff engaged in favoritism, and that Plaintiff would use food and money as bribes.  (Defs.' 56.1 ¶ 27.)  One student, JN, came to Dr. Weitmann crying and complaining that Plaintiff asked her to fight another student, and that she was asked to remove her makeup covering a bruised eye.  (Defs.' 56.1 ¶ 27.)

On May 1, 2017, Plaintiff sent an email to Defendant Harris, advising that student SR had informed her that Harris instructed SR that she did not have to go to Plaintiff's class due to an investigation Harris was conducting on Plaintiff and her teaching aide, Yolando Mercado, and requesting a meeting regarding "false allegations of 'targeting' SR."  (Defs.' 56.1 ¶ 27; ECF No. 85 ("Rushfield Aff."), Exh. X ("Plaintiff's Deposition Exh. 60")).  Defendant Harris met with Plaintiff and her union representative on May 3, 2017, during which SR's allegations were discussed with Plaintiff and her union representative.  (Defs.' 56.1 ¶ 30.)

On or about May 12, 2017, Harris reported to Superintendent Gaudette that Plaintiff was alleged by students to be engaging in misconduct, including bullying students and/or using students to bully other students, and was encouraging students to fight.  (Defs.' 56.1 ¶ 31.) Superintendent Gaudette advised Harris that she should report the alleged misconduct to the New York Justice Center (the "Justice Center").  (Defs.' 56.1 ¶ 33.)

### 3.  Justice Center Complaint and Investigation

On May 12, 2017, Defendant Harris called the Justice Center to report the student allegations concerning Plaintiff.  (Defs.' 56.1 ¶¶ 36, 38.)  Harris ultimately decided to make the call based on after learning that student JN was pulled out of Plaintiff's classroom, taken to a back room, and asked to remove her makeup and respond to a series of questions.  (Pl.'s 56.1 Counterstatement ¶ 127.)  Harris also shared other allegations to the Justice Center.  (Pl.'s 56.1

Counterstatement ¶ 128.)

While the Justice Center investigation was ongoing, Superintendent Gaudette was replaced by David Bernsley, who became the District's Superintendent of Schools on August 1, 2017 and continued in that position for the 2017-18 school year.  (Defs.' 56.1 ¶ 40.)  On September 2, 2017, Superintendent Bernsley provided his written report to the District's Board of Education, where he described a conversation he had the day before with a Justice Center supervising inspector conducting the investigation regarding the allegations against Plaintiff.  (Defs.' 56.1 ¶ 41; Rushfield Aff., Exh. F ("Plaintiff's Deposition Exh. 3.)  In his report, Bernsley wrote the following: "Additionally, there is a minimum of three charges they have substantiated (guilty), with a possibility of more charges being substantiated. The report will clarify all of the charges and the evidence they have to substantiate the charges." (Rushfield Aff., Exh. F ("Plaintiff's Deposition Exh. 3.)).

On October 30, 2017, the Office of General Counsel for the Justice Center issued a letter to Superintendent Bernsley, identifying five allegations of neglect as against Plaintiff and informing the District that each of the five allegations of neglect had been "UNSUBSTANTIATED."  (Defs.' 56.1 ¶ 43; Rushfield Aff., Exh. I (Plaintiff's Deposition Exh. 9.). The letter also stated the following:

> "The employee has been advised that these findings do not preclude you, as the employer, from taking employment action, including the commencement of disciplinary action they determine to be appropriate, and that is consistent with any applicable collective bargaining agreement.
>
> The Justice Center does not make any specific recommendations for corrective actions with respect to this incident, but recommends that the provider implement any actions determined to be appropriate based on its review of the incident."

(*Id*.)

On November 3, 2017, Superintendent Bernsley issued a report to the District's Board of

6

Education, in which he wrote the following:

> "The Justice Center's final decision regarding the investigation conducted on our employee who has been on paid administrative leave since last May ruled all of the charges unsubstantiated, a disturbing judgment, it would seem, as the Justice Center's chief investigator, himself, recommended multiple substantiated findings against the staff member. Apparently, the Office of General Counsel, which renders a final decision, reversed all of the chief investigator's original findings. An office supervisor at the Justice Center has assured me procurement of the original report detailing recommendations for substantiated findings on all the allegations. Included in the original report, will be the employee's admission of guilt and other details that support it."

(Rushfield Aff., Exh. J (Plaintiff's Deposition Exh. 10.)

That same day, the Office of General Counsel for the Justice Center provided a letter addressed to Superintendent Bernsley, which attached a Case Summary Report, dated September 10, 2017, on its investigation concerning Plaintiff. (Rushfield Aff., Exh. L (Plaintiff's Deposition Exh. 12.). The Case Summary report summarized eight interviews, conducted by Justice Center investigator Constance Montgomery, with students (including victims) and staff at the school. (*Id*.) The investigator wrote the following summary of her investigation:

> "After interviewing four students who may or may not be friends and two Aides who witnessed instances of questionable response by Ms. Alvarado with her students; it's the finding that Ms. Alvarado has at times shown favoritism with certain students, that she has at times made inappropriate comments and behaviors with students, which causes a hostile environment for students to learn. She has offered gift, food and money to bully other students that are "disrespectful to her", which she did admit (sic) "All student (sic) stand up for her and tell other students don't be disrespecting Ms. Alvarado", a response in which she appears to encourage rather than interrupt and re-direct all students. Since this is a re-campus like setting, her reach goes beyond the school day and could be disruptive for the entire campus as she has pointed out she has students from the past and present at Edenwald, JCCA and Mt. Pleasant Cottage School. There were 10 students named that were not interviewed that could possible (sic) provide additional insight to the scope of the problems Ms. Alvarado (sic) presence in the school presence (sic) for the school/campus. [Redacted names] were not named in the report as [redacted name] was not interviewed as she refused to talk to investigator and [redacted name] went into placement and investigator did not want to interfere with her new setting."

(*Id*.)

By letter of November 21, 2017, Lynn Gislason, Senior Investigator of the New York State Education Department, Office of Special Education, Incident Management Unit, wrote to Superintendent Bernsley, confirming that the Justice Center had completed its investigation of the allegations against Plaintiff and had determined that the allegations were unsubstantiated. (Rushfield Aff., Exh. M (Plaintiff's Deposition Exh. 13.))  However, the letter indicated that the following identified from the investigation required corrective action:

> "During April and May 2017 Maria Alvorado [sic] has at times shown favoritism with certain students, that she has at times made inappropriate comments and behaviors with students, which causes a hostile environment for students to learn. She has offered gift, food and money to bully other students that are "disrespectful to her", which she did admit (stet) "All students stand up for her and tell other students don't be disrespecting Ms. Alvarado, a response in which she appears to encourage rather than interrupt and redirect all students. Since this is a campus like setting, her reach goes beyond the school day and could be disruptive for the entire campus as she has pointed out she has students from the past and present at Edenwald, JCCA and Mt. Pleasant Cottage school [sic]."

(*Id.*)

The letter stated that:

> "As required by 8 NYCRR §200.15(f)(4), upon receipt of an investigative report of abuse or neglect that identifies the need for corrective action. (stet) The residential school must develop a plan(s) of prevention and remediation. In developing this Plan(s), the school must consider any recommendations of the Justice Center and/or the New York State Education Department for preventive and remedial action, including any legal remedy if required. The Plan must address the underlying cause of the reported incident and ensure the safety of students and staff."

(*Id.*)

Finally, the letter indicated that a Compliance Plan was required to be filled out within 30 days, and partly-filled out Compliance Plan form was attached to the letter.  (*Id.*)  On January 12, 2018, Superintendent Bernsley filled out the Compliance Plan, stating that the School District was "researching and discussing possible appropriate recourse concerning Ms. Alvarado; that based upon the understanding that the Justice Center investigators had found at least three of the charges

substantiated (with the Office of Legal Counsel having overturned those charges), the District has serious concerns having Alvarado teach students and interacting with staff; and that in the event of Alvarado's return to work in the District, a Compliance Plan would be submitted to the State Education Department."  (Defs.' 56.1 ¶ 49; Rushfield Aff., Exh. N (Plaintiff's Deposition Exh. 14.)

### 4.  Plaintiff's administrative leave and restrictions on teaching ability

On or about May 12, 2017, after receiving Defendant Harris's report about the allegations made by the students and around the time that Defendant Harris made a complaint to the Justice Center, then-Superintendent Gaudette spoke with Plaintiff about taking voluntary paid administrative leave of absence until the Justice Center completed its investigation of the allegations against Plaintiff, which she took.  (Defs.' 56.1 ¶ 32 (citing Gaudette Deposition Tr. 197:12–122; 199:20–22)). Plaintiff contests that her administrative leave was voluntary, and instead states that she took it because she was being threatened with 3020-a charges. (Pl.'s 56.1 Counterstatement ¶ 132.).

While the Justice Center investigation was pending, Plaintiff filed a complaint of, *inter alia*, retaliation and discrimination with the New York State Division of Human Rights (the "SDHR Complaint") on June 30, 2017, naming the School District and Defendants Harris, Leamon, and Dr. Weitmann.  (Gould Decl., Exh. 1.).  The School District received Plaintiff's SDHR Complaint on August 17, 2017.  (Pl.'s 56.1 Counterstatement ¶ 135; ECF No. 86. ("Stephen Beovich Aff.") ¶ 3.)

In August 2018, Stephen Beovich replaced Superintendent Bernsley, becoming Acting or Interim Superintendent of Schools of the District.  (Defs.' 56.1 ¶ 60.).   After consultations with the Board of Education, counsel for the District, and Defendant Harris, Superintendent Beovich

determined in late August 2018 that Plaintiff should return to work at the beginning of the 2018-19 school year, but be assigned the duties of a curriculum designer. (Defs.' 56.1 ¶ 63.) Superintendent Beovich also advised Defendant Harris that no other students would be in the room with Plaintiff when she was working on writing curriculum. (Defs.' 56.1 ¶ 65.)

In December 2018, Superintendent Beovich decided to relocate Plaintiff from Mount Pleasant Cottage School to the Edenwald School commencing in January 2019 because of concerns with Plaintiff's reported high-risk pregnancy and concerns that Mount Pleasant Cottage School teacher aide Yolanda Mercado was bringing students to Plaintiff's work room. (Defs.' 56.1 ¶ 66.) However, Plaintiff disagreed with being moved, and after the District spoke with Plaintiff's counsel at that time, Plaintiff was permitted to work as a curriculum designer from her home for the remainder of the 2018 to 2019 school year. (Defs.' 56.1 ¶ 67.) Plaintiff was on maternity leave for the first half of the 2019 through January 2020. (Defs.' 56.1 ¶ 68.)

Superintendent Beovich testified that sometime between January 2019 and November 2019, he came across former-Superintendent Bernsley's January 12, 2018 Compliance Plan, and later he secured a copy of the September 10, 2017 Justice Center Case Summary Report concerning Plaintiff. (Defs.' 56.1 ¶ 69.) On November 21, 2019, Superintendent Beovich filed a formal complaint with the New York State Department of Education pursuant to Part 83 of the Regulations of the Commissioner of Education concerning Plaintiff's moral character and her fitness to hold a New York State teaching certificate. (Defs.' 56.1 ¶ 70.) He also emailed the Justice Center to determine if the 2017 findings could be appealed, and was informed it could not be appealed. (Pl.'s 56.1 Counterstatement ¶ 188.)

Before Plaintiff's return from maternity leave, the District determined that Plaintiff would return to teaching through a co-teaching assignment at the Edenwald School, and the details of the

10

directives to Plaintiff as part of that assignment were set forth in a January 6, 2020 letter prepared by Superintendent Beovich and counsel for the District for issuance by Edenwald School Principal Leamon to Plaintiff; the limitations, set forth in bullet points in that letter, were that (1) under no circumstances was Plaintiff to be alone with a student; (2) if a co-teacher was absent from the class, Plaintiff was to report to her office and write lesson plans; (3) before entering any building on campus besides the Edenwald School, Plaintiff must receive prior written approval from the Superintendent; (4) under no circumstances was Plaintiff to take any pictures of students or post the pictures of students on a social media account; (5) Plaintiff was not to engage in personal conversations with students about herself or the students' relationships with their families, other students and/or other members of the staff.   (Defs.' 56.1 ¶ 70; Rushfield Aff., Exh. T (Plaintiff's Deposition Exh. 51.)

As a result, Plaintiff now serves as a co-teacher in the Edenwald School, which involves her rotating into the classrooms of five special education teachers in order to teach their special education students social studies while another teacher is present.  (Defs.' 56.1 ¶ 75.)

Prior to May 2017, Plaintiff earned extra income ($40.00/hour) by tutoring for four hours a week between October and June, but she has not done so since then, as she is not allowed to be with students alone.  (Pl.'s 56.1 Counterstatement ¶ 198.)  While the students she co-teaches are special education students, she is not allowed to log into their Individual Education Program profiles.   (Pl.'s 56.1 Counterstatement ¶ 202.)

In his deposition, Superintendent Beovich indicated that the District did not submit a follow-up "Abuse/Neglect Incident Plan of Prevention and Remediation (PPR) Compliance Plan (CP)" to the State Education Department because it was advised by the State Education Department that submission of such a follow-up plan was not required.  (Defs.' 56.1 ¶ 76.)

11

**B.  Procedural Background**

On January 19, 2018, Plaintiff commenced this action pursuant to both federal and state law, alleging that (1) the School District violated Title VII by condoning a hostile work environment stemming from sex-based, race/national origin-based, and disability-based harassments; (2) the School District retaliated against Plaintiff for filing the September 26 Complaint against Mr. Sheppard; (3) all Defendants violated NYSHRL based on the same acts of harassment and retaliation alleged in Plaintiff's Title VII claims; and (4) the Individual Defendants engaged in various common-law torts, such as defamation, intentional and negligent infliction of emotional distress, and tortious interference with contract.  (ECF No. 1.)  Defendants then answered on March 19, 2018.  (ECF No. 21.)  At proceedings held on May 24, 2018, the Court granted Plaintiff leave to file an amended complaint and Defendants' leave to file a motion to dismiss or motion for judgment on the pleadings.  Thereafter, on June 7, 2018, Plaintiff filed the amended complaint, which removed her disability-based claims.  Defendants moved to dismiss on July 9, 2018.  (ECF No. 36.)

On August 27, 2019, the Court granted dismissal in part. (ECF No. 43.)  The court dismissed all of Plaintiff's claims except Plaintiff's Title VII retaliation claim against the School District premised on Defendant Harris' conduct around the time that she made the May 2017 complaint to the Justice Center.  Plaintiff filed the TAC on February 23, 2020 (ECF No. 51) and Defendants answered on March 5, 2020 (ECF No. 52).  On December 15, 2021, the Court granted Defendants leave to file a motion for summary judgment.  (ECF No. 78.)  Briefing on the motion for summary judgment was completed as of June 24, 2022.  (ECF No. 84.)

## STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; a*ccord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250. Summary judgment should be

granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation") (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

## DISCUSSION

The TAC contains two causes of action, all of which are at issue on the Motion. *First*, Plaintiff asserts a Title VII retaliation claim on the basis of gender, race, and national origin against the School District. (TAC ¶¶ 65–69.) *Second*, focusing on the same conduct at issue in her Title VII claims, Plaintiff asserts a cause of action against all Defendants under NYSHRL. (*Id.* ¶¶ 44–45, 49–50.) For the reasons stated below, the Court GRANTS summary judgment on both claims.

### I.    Title VII Retaliation Claims

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Courts analyze discrimination claims brought under Title VII using the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Barbini v. First Niagara Bank N.A.*, No. 16 CIV. 7887 (NSR), 2022 WL 623184, at *15 (S.D.N.Y. Mar. 3, 2022)*; Tubo v. Orange Reg'l Med. Ctr.*,

No. 13-CV-1495 NSR, 2015 WL 5945853, at *6 (S.D.N.Y. Oct. 13, 2015), *aff'd*, 690 F. App'x

736 (2d Cir. 2017).

Regarding employment retaliation claims, Title VII protects "the filing of formal charges

of discrimination . . . as well informal protests of discriminatory employment practices." *Littlejohn*

*v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015) (quoting *Sumner v. U.S. Postal Serv.*, 899

F.2d 203, 209 (2d Cir. 1990)).   To make out a prima facie case of retaliation, plaintiff must

establish "(1) participation in a protected activity; (2) that the defendant knew of the protected

activity; (3) an adverse employment action; and (4) a causal connection between the protected

activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)

(internal quotation marks omitted). "Protected activity is action taken to protest or oppose

statutorily prohibited discrimination." *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir.

2019) (quotation marks omitted).

Under the *McDonnell Douglas* standard, if Plaintiff makes a prima facie showing and

defendant then provides a legitimate non-retaliatory reason for the adverse employment action, a

plaintiff then "must prove 'that the desire to retaliate was the but-for cause of the challenged

employment action.'" *Lyons v. New York, Div. of Police*, No. 15 CIV. 3669 (NSR), 2020 WL

2857157, at *12 (S.D.N.Y. June 2, 2020), *on reconsideration in* part sub nom. *Lyons v. New York*,

No. 15 CIV. 3669 (NSR), 2021 WL 1226957 (S.D.N.Y. Mar. 31, 2021) (citation omitted).   At the

pretext stage, a plaintiff "may rely on evidence comprising her prima facie case, including temporal

proximity, together with other evidence such as inconsistent employer explanations, to defeat

summary judgment[.]" *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 403 (S.D.N.Y.

2014) (quoting *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 847 (2d Cir. 2013)). The pretext stage

"does not require proof that retaliation was the only cause of the employer's action, but only that

the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846. A plaintiff can meet this burden by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-retaliatory reasons for its action." *Id*.

As in any other case, a plaintiff in an employment discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)) (internal citations omitted).

Defendants argue that Plaintiff does not make out a prima facie case for her Title VII retaliation claim. The parties do not dispute that Plaintiff engaged in protected activity by doing the following: (i) filing an internal discrimination complaint with the School District in September 2016; (ii) filing a complaint with SDHR in June 2017; and (iii) filing the instant action. (*See* ECF No. 94 ("Pl.'s Opp.") at 13–14.) Defendants instead contest the following: that Plaintiff (i) has not been subjected to an adverse action and (ii) that Plaintiff fails to establish a but-for causal connection between her protected activity and purported adverse actions. (ECF No. 87 ("Defs.' Br.") at 18–25.) Defendants argue that even if Plaintiff establishes a prima facie case for Title VII retaliation, she fails to present evidence demonstrating that Defendants' course of actions against Plaintiff were carried out for pretextual reasons. (Defs.' Br. at 24.)

For the reasons stated below, the Court GRANTS summary judgment on Plaintiff's Title VII retaliation claim.

**A. Whether Plaintiff was subjected to an adverse employment action**

Under Title VII, the definition of an "adverse employment action" is broad. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015). For purposes of retaliation claims, an "adverse employment action" must lead to a "materially adverse change." *Carter v. New York*, 310 F. Supp. 2d 468, 479 (N.D.N.Y. 2004). Ultimately, there is no bright line rule and the context of the decision is what matters. Courts will look at "whether the [alleged adverse action] to which [the plaintiff] was subjected could well have dissuaded a reasonable employee" from "complaining of unlawful discrimination." *Davis-Garrett v. Urban Outfitters, Incorporated*, 921 F.3d 30, 43–44 (2d Cir. 2019). Examples of adverse actions "include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (internal quotation marks and citation omitted).

Plaintiff argues that the following constitute adverse employment action: (i) that the District employee Harris made a report against her to the Justice Center on May 15, 2017 after she had made complaints about gender and race related harassment she experienced; (ii) that Plaintiff was forced to take administrative leave with pay, "which kept her out of work for more than one full school year . . . ," from May 2017 to September 2018; (iii) that when Plaintiff was permitted to return to work, she was assigned to write curriculum, rather than return to her former duties as a classroom teacher during the commencement of the 2018-19 school year; (iv) that when she returned from maternity leave in early 2020, Plaintiff could only could only co-teach alongside other teachers and was not permitted to be alone with students, and therefore she was barred from opportunities to tutor students and gain extra income during the school year; and (v) that around

the time that Plaintiff was returning from maternity leave, Superintendent Beovich initiated a Part 83 complaint against her seeking to have her teaching license revoked.  (Pl.'s Opp. at 15-17).

Defendants concede that the May 2017 Justice Center complaint filed against her does provide a basis for an adverse employment action.  (Defs.' Br. at 19.)   However, Defendants, in a blanket manner, state that the other actions do not constitute adverse employment actions under Title VII—but they only offer arguments that Plaintiff's administrative leave does not constitute adverse employment action because it was voluntary, and fail to address the other actions.   (*Id.*) Notably, Plaintiff contests that characterization of her administrative leave, arguing that she had not "volunteered to take leave," and rather, she was sent home involuntarily and threatened with New York Education Law Section 3020-a charges.   (Pl.'s Opp. at 15 n.5.)  It is also unclear from the record whether putting employees on administrative leave pending an investigation is part of the School District's preexisting disciplinary policies, as that would mean Plaintiff's administrative leave, even if forced, would not constitute an adverse employment action.  *See Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("We agree that an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner.")

Even assuming that Plaintiff's administrative leave, co-teaching requirement, requirement that she design curriculum rather than teach in the classroom, and Superintendent Beovich's Part 83[3] complaint all constitute adverse employment actions, the Court nonetheless grants summary judgment because Plaintiff fails to establish a causal connection between her protected activity and any of her complained-about employment actions.

**B.  But for causation between the protected activity and the adverse employment actions**

---

[3]         Part 83 is a Moral Character Action that can be filed pursuant to the New York State's education regulations, 8 N.Y.C.R.R. § 83.1 *et seq*.

The Court notes that none of the parties appear to make any argument as to whether Plaintiff sufficiently establishes causation with respect to her prima facie burden, and instead focus on the pretext stage of the *McDonnell Douglas* burden shifting analysis – *i.e.,* whether the desire to retaliate was the but-for cause of the challenged employment action. *See Giscombe*, 39 F. Supp. 3d at 403.

None of the parties dispute, and the Court finds, that Defendants have satisfied their burden of proffering a non-retaliatory reason for their employment actions. *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013), (stating that if the plaintiff sets forth a prima facie case of discrimination, "the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action.") *aff'd*, 586 F. App'x 739 (2d Cir. 2014) (quoting *McDonnell Douglas*, 411 U.S. at 802–03). As Defendants explain in their papers:

> "Each and every action of the District concerning the Plaintiff that followed the May 12, 2017 report to the Justice Center, including the May 2017 request that the Plaintiff accept a voluntary paid administrative leave, that the Plaintiff be assigned as a curriculum designer rather than returning to solo teaching of a class and that the Plaintiff thereafter, following her maternity leave, be assigned as a co-teacher with strictures designed to limit her ability to interface with students on the District's campus without the presence of other staff, was clearly designed to address (1) the allegations that were made by some five of the Plaintiff's students, (2) the information being provided to the District by the Justice Center in advance of its Office of General Counsel's October 30, 2017 'UNSUBSTANTIATED' determination, (3) the Case Summary Report in which the investigator found, among other things, that the Plaintiff was using students to bully other students and dramatically characterized the Plaintiff's conduct as creating a hostile student environment in the District and (4) the dictates of the State Education Department and Justice Center that the District establish a plan of prevention and remediation to address the findings of the Justice Center investigator and "ensure the safety of students and staff" despite the 'UNSUBSTANTIATED' determination of the Justice Center's Office of General Counsel."

(Defs.' Br. at 24.)

Plaintiff argues that each of the adverse employment actions she experienced are causally connected with one or more of the lawsuits she filed against the School District and other school staff.  (Pl.'s Opp. at 18.).   First, though the arguments are thin and sparse, Plaintiff appears to argue that Defendant Harris's decision to complain with the Justice Center is connected with the alleged fact that she is close friends with Defendant Leamon, who is married to Mr. Sheppard (whom Plaintiff made an internal discrimination claim against).  (Pl.'s Opp. at 2, 18.). Second, Plaintiff argues that there is a causal connection between her filing of her SDHR complaint and the instant action and the following: (i) the School District's failure to take her off of administrative leave even though the Justice Center investigation found that the allegations against Plaintiff were unsubstantiated on October 30, 2017; (ii) the  imposition of her teaching restrictions, including her assignment as curriculum designer and later-on, her ability to teach only as a co-teacher. [4]  (Pl.'s Opp. at 20.)

For the reasons explained below, the Court finds that the record does not sufficiently support Plaintiff's causation arguments, and Plaintiff fails to point to any admissible evidence creating a material issue of fact in her favor.

### 1. "But-for causal connection between discrimination complaint against Mr. Sheppard and the May 2017 Justice Center Complaint[5]

_____

[4]      Plaintiff also argues that the record shows that Superintendent Bernsley had consulted with counsel regarding the grounds to pursue New York Education Law Section 3020-a charges just a few weeks after she filed the instant action in January 2018. (Pl.'s Opp. at 20.)  Because such charges were not filed against her, nor does she show she was aware that the School District was contemplating bringing those charges during the relevant time, Plaintiff cannot base her retaliation claim on this fact.

[5]      The Court notes that while Plaintiff does not allege that the School District itself acted with retaliatory motive with respect to the May 2017 Justice Center complaint, the School District could be held vicariously liable for the actions of Defendant Harris, as it is undisputed that Defendant Harris was Plaintiff's supervisor.   See, e.g. Bethea v. City of New York, No. 11 CV 2347 (SJ) (MJA), 2014 WL 2616897, at *7 (E.D.N.Y. June 12, 2014) ("[H]arassment and the retaliation at the hands of a supervisor empowered to take tangible employment actions will trigger an employer's vicarious liability, but an employer is also liable where it has negligently allowed harassment or retaliation to occur or persist."); Muraj v. UPS Freight Servs., No. 04-CV-6563 CJS, 2006 WL 2528538, at *3 (W.D.N.Y. Aug. 31, 2006) (concluding that "under general principles of vicarious liability under Title VII, an employer may be held vicariously liable for tangible employment actions taken by its supervisors," which includes retaliation).

The Court first starts by considering whether Plaintiff establishes a but-for causal connection between the complaint she filed against Mr. Sheppard in September 2016 and the complaint made against her to the Justice Center by Defendant Harris in May 2017.  The Court notes, as it did before in its previous decision, that the eight month gap between the two events, on their own, may be too attenuated to support Plaintiff's claim merely based on temporal proximity. *See Alvarado v. Mount Pleasant Cottage Sch. Dist*., 404 F. Supp. 3d 763, 785 (S.D.N.Y. 2019).

In any event, Plaintiff fails to provide any meaningful argument that there is causal connection between the filing of her internal discrimination complaint against Mr. Sheppard and the May 2017 Justice Center complaint filed against her.  In addition, the Court's review of the record indicates that it fails to support any connection — the most Plaintiff attempts to do is cite to hearsay evidence in her 56.1 statement that Leamon (Mr. Sheppard's spouse) was close friends with Harris, which the Court cannot consider on this motion.  *See Barkley v. Penn Yan Cent. Sch. Dist*., 442 F. App'x 581, 585 (2d Cir. 2011); (Pl.'s 56.1 Counterstatement ¶ 103) (citing Plaintiff's deposition indicating that several staff members had discussed with her the friendship between Defendants Leamon and Harris).  Plaintiff also alleges that Defendant Harris attempted to pressure employees to provide false information about Plaintiff (Pl.'s Opp. at 7), but she fails to make any argument regarding how that shows retaliatory intent with respect to Plaintiff's complaint made about Mr. Sheppard. (*See, e.g.*, Pl.'s 56.1 Counterstatement ¶¶ 125–26) ("During her deposition, Harris equivocated as to which students she interviewed regarding the 'water bottle incident and as to whether she was present when a student admitted that she, the student, and not [Plaintiff] had thrown the water bottle . . .").[6]

---

[6]     While Plaintiff states that Defendant Harris attempted to obtain a false allegation regarding the water bottle incident—where it was unclear whether Plaintiff or a student threw a water bottle (Pl.'s Opp. at 7) —Defendants indicate that such allegation was never shared with the Justice Center.  (*See* Defs.' Response to Pl.'s Counterstatement

Defendants also argue that Defendant Harris is a mandatory reporter under New York Social Services Law § 497, which states that "[a]ny person participating reasonably and in good faith in making a report . . . shall have immunity from any such liability, civil or criminal," and that a plaintiff may rebut this presumption of good faith with a showing that the reporters engaged in "willful misconduct or gross negligence." (Defs.' Br.at 22 (citing N.Y. Soc. Serv. Law § 497)). Defendants cite to the Court's previous decision indicating that "the Second Circuit has made it clear that a plaintiff challenging a mandated reporter's conduct must clearly establish retaliatory or punitive intent. *Alvarado*, 404 F. Supp. 3d at 788 (citing *Maco v. Baldwin Union Free Sch. Dist.*, 726 F. App'x 37, 39 & n.1 (2d Cir. 2018)).   In her opposition, Plaintiff argues that Defendants cannot use that defense since they failed to raise it in their answer to the TAC, and that in any event, a reasonable jury could conclude that Defendant Harris did not act in good faith in making the report to the Justice Center.  (Pl.'s Opp. at 19 n.6.)

The Court need not resolve the issue of whether Defendants could properly raise an immunity defense under Social Services Law § 497 at this juncture, given that Plaintiff's arguments and the record as presented fails to show any causation, much less but-for causation, between Plaintiff's filing of her internal discrimination claim against Mr. Sheppard and the Justice Center complaint filed against her.

### 2. But-for connection between ongoing work restrictions and lawsuits filed by Plaintiff

To reiterate the above, Plaintiff filed her SDHR complaint in June 2017 and the instant action in January 2018.  Plaintiff argues that but-for causation can be shown between her filing of those lawsuits and her employment restrictions by the fact that (i) she was not taken off of

---

¶ 124; Rushfield Aff., Exh. Z. ("Plaintiff's Deposition Exh. E.); Rushfield Aff., Exh. L (Plaintiff's Deposition Exh. 12.)

administrative leave soon after the Justice Center had concluded that the allegations raised against her were unsubstantiated in October 2017, and instead was kept on leave until the start of the 2018-2019 school year; and (ii) when she returned to work for the 2018-2019 year, she was not allowed to teach alone in the classroom and was instead assigned to a curriculum designer role for the 2018-2019 school year and upon returning from maternity leave to the present, she could only co-teach.  (*See* Pl.'s Opp. at 20.)

Defendants offer a legitimate, non-discriminatory reason for implementing the employment restrictions, which is supported by the record.  The record shows that though the Justice Center investigation found that the allegations against Plaintiff were unsubstantiated, the School District was nonetheless required to figure out why those allegations came about, and implement a compliance plan to address the issue.  (*See* Rushfield Aff., Exh. M (Plaintiff's Deposition Exh. 13.)).  The record also shows that the School District did so accordingly, by limiting Plaintiffs' one-on-one interactions with students.  Lastly, the record shows that the Superintendents were concerned about the allegations regarding Plaintiff's purportedly inappropriate behavior with students.   (*See, e.g.,* Rushfield Reply Aff., Exh. F (Beovich Deposition), Tr. 214:23-25 ("I believe that the directives that we drafted were the best way to keep out students safe."); Gould. Decl., Exh. 36 (Plaintiff's Deposition Exh. 53) (On September 22, 2020, Superintendent Beovich states to counsel, "I can not get an explanation on why [the Justice Center investigation] was unsubstantiated and all I am trying to do is protect children.")).

Plaintiffs point to nothing on the record creating a material issue of fact with respect to Defendants' proffered reason.  Nor do they point to any admissible evidence, as required, supporting their argument that retaliatory motive was a but-for reason for the restrictions imposed on Plaintiff's employment. *See Brown*, 257 F.3d at 252 (Plaintiff in an employment discrimination

case faced with a summary judgment motion "must come forth with evidence sufficient to allow a reasonable jury to find in her favor.").

Plaintiff merely argues that if it were true that Defendants only imposed those restrictions on Plaintiff's ability to teach and interact with students because they were concerned about keeping students safe, then they could have done so through less onerous means.  (Pl.'s Opp. at 22.) However, disagreement with the employer's course of action is not sufficient to show that retaliation was a "but for" cause.  *See Sharpe v. Utica Mut. Ins. Co*., 756 F.Supp.2d 230, 250 (N.D.N.Y.2010) ("[T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.") (citing *Rodriguez v. City of New York*, 644 F.Supp.2d 168, 187 (E.D.N.Y.2008)); *Randall v. Potter*, No. 01–CV–2097, 2004 WL 439491, at *5 (S.D.N.Y. Mar. 9, 2004) (finding that even if defendant-employer terminated plaintiff based on an incorrect belief that plaintiff had engaged in improper conduct, that belief did not establish an inference of discrimination);  *Miller v. Nat'l Assoc. of Sec. Dealers, Inc*., 703 F.Supp.2d 230, 247 (E.D.N.Y.2010) ("The relevant inquiry is not whether the performance-based justification for plaintiff's termination articulated by defendant is accurate or fair, but whether plaintiff can show any evidence that it was not the actual justification.  Plaintiff cannot accomplish this by stating his disagreement with his supervisors' negative assessment of his performance, even [if he] has evidence that the decision was objectively incorrect." (alteration in original) (citations and internal quotations marks omitted)).

Plaintiff also argues, citing to no supporting case law, that an inference could be made of retaliatory motive based on the fact that "decision-makers" at the School District did not speak

24

directly with students who raised allegations against her in the Justice Center complaint, that no decision-maker spoke to the investigator who interviewed the students and staff, nor did a decision-maker ever listen to the Justice Center tapes of the interview of students and staff.  (Pl.'s Opp. at 20.)  However, this argument, too, is insufficient to establish retaliatory motive.  *See Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 232 (E.D.N.Y. 2014) ("Whether Defendants' actions were unreasonable, unfair or even untrue, as Plaintiff alleges, without any showing of retaliatory motive, they do not support Plaintiff's retaliation claim."); *Delaney v. Bank of Am. Corp*., 908 F.Supp.2d 498, 518 (S.D.N.Y.2012) ("it is not for the Court to second-guess the business judgment for a termination, so long as there is no evidence that the reason for the decision was a pretext for [retaliation].").

Because Plaintiff has failed to meet her burden of demonstrating any "weaknesses, implausibilities, inconsistencies, or contradictions," *see Kwan*, 737 F.3d at 846 in the School District's proffered, non-retaliatory reason for imposing her job restrictions, Plaintiff's Title VII retaliation claim must be dismissed.

## II.    NYSHRL Retaliation Claim

Retaliation claims under NYSRL are governed under the same standards as Title VII.  *See Abromavage v. Deutsche Bank Sec. Inc*., No. 18-CV-6621 (VEC), 2021 WL 1061596, at *3 (S.D.N.Y. Mar. 19, 2021), *aff'd*, No. 21-668, 2022 WL 4360950 (2d Cir. Sept. 21, 2022); *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).  Claims that individual defendants aided and abetted violations of NYSHRL, in violation of N.Y. Exec. L. § 296(6), are tied to the primary NYSHRL violation.  If a plaintiff is unable to establish retaliation pursuant to NYSHRL, then he likewise cannot establish liability for aiding and abetting such retaliation. *See White v. Pacifica Found.*, 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013) (collecting cases).

Therefore, the Court grants Defendants' motion for summary judgment as to Plaintiff's state law retaliation claim for the same reasons discussed under the Title VII retaliation claim.

## **CONCLUSION**

For the foregoing reasons, Defendants' summary judgment motion is GRANTED, and Plaintiff's Title VII retaliation and NYSHRL claims are DISMISSED with prejudice.

The Court notes that on January 21, 2023, Plaintiff filed a letter seeking leave to file a motion to supplement her TAC with new allegations pertaining to facts that have occurred since the filing of the TAC, pursuant to Fed. R. Civ. P. 56(d). (ECF No. 104.) Specifically, Plaintiff seeks to include facts stating that around January 11, 2023, the School District has asked her to resign or face possible disciplinary charges in connection with allegations made against her that she harassed another school employee off-site at a party in December 2022. (ECF No. 104). Because Plaintiff declined to resign, she was placed on paid administrative leave pending the School District's determination of the disciplinary charges to bring against her. (ECF No. 104). Defendants opposed Plaintiff's request, stating that the new allegations have no relationship with the allegations made in the TAC. (ECF No. 108.) On January 31, 2023, the Court issued a memorandum endorsement staying resolution of the Plaintiff's request to seek leave to file a motion to supplement her pleadings, noting that in the event the Court grants leave, Plaintiff will be directed to supplement her pleadings through a Fourth Amended Complaint. (ECF No. 109.)

In light of the Court's January 31, 2023 memorandum endorsement (ECF No. 109), the Court grants Plaintiff leave to file a motion seeking leave to file a Fourth Amended Complaint consistent with this Order and Opinion, such that Plaintiff may only seek to assert retaliation claims. Plaintiff is directed to serve (not file) her opening motion papers on or before March 28, 2023. Defendants are directed to serve (not file) an opposition to Plaintiff's motion to file a Fourth

Amended Complaint on or before April 18, 2023.  Plaintiff is directed to file reply papers on or before April 28, 2023.  The parties are directed to file their papers on ECF on the reply date, April 28, 2023.  The parties are also directed to mail two courtesy hard copies and one electronic copy to chambers as the papers are served.

 If Plaintiff fails to timely file her motion for leave to file a Fourth Amended Complaint, Plaintiff's claims for retaliation will be deemed dismissed with prejudice.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 84.

Dated:   March 7, 2023                                        SO ORDERED:
         White Plains, New York

                                              _____
                                                    NELSON S. ROMÁN
                                              United States District Judge